# CHARLESTON.

STATE v. PAUL ROUSH.

Submitted November 13, 1923.   Decided November 20, 1923

1. CRIMINAL LAW—*How Corpus Delicti Must be Established to Sustain Conviction; Evidence of Defendant's Agency in Commission of Crime Must Preclude Any Reasonable 'Hypothesis of Other Causes.*

   In order to sustain a conviction for the commission of a crime, the corpus delicti must be established beyond any reasonable doubt by evidence, or by cogent and irresistible grounds of presumption. The evidence of defendant's agency in the commission of the supposed crime must be so clear and convincing as to exclude any reasonable hypothesis of other causes. (p. 142).

2. HOMICIDE—*Evidence Held Insufficient to Establish Corpus Delicti.*

   Where the evidence discloses that a young man, 21 years old, of slight statute, weighing 135 lbs., whose arms had been

injured and incapacitated by a previous railway accident, struck deceased two blows with his bare fist in the face leaving slight discoloration of the skin; that deceased was a large man weighing 247 lbs. and 5 ft. 9 inches in height and of robust physical prowess; that deceased had been within a few hours previous drinking moonshine and other liquors to intoxication, and upon being struck sank down on the street slowly as if laying down, and a few minutes afterwards expired, the autopsy disclosing a blood clot at the base of the brain as the cause of death, but no congestion of the brain, nor any internal evidences of injury to the brain other than the blood clot; that there was a slight discoloration on the inside of the skin on the back of the head discernible only after the scalp had been removed, and no injury to the skull; and the medical expert, not experienced in brain surgery, says death might possibly have resulted from the blows; and it appears that there was no ill feeling between the parties, and no motive for the act; the *corpus delicti* has not been proved to the full measure of the law, and a verdict of murder based thereon will be set aside and a new trial awarded.     (p. 142).

3.  SAME—*Malice Essential to Murder in the Second Degree; Where Malice Cannot be Imputed to Accused, Instruction That Jury May Return Either First or Second Degree Murder Erroneous.*

   Malice express or implied is a necessary element of murder in the second degree; and where in a trial for murder the evidence is such that malice either express or implied cannot be imputed to the accused, it is error to instruct the jury that it may return either first or second degree murder. (p. 144).

4.  CRIMINAL LAW—*Instructions as to Conspiracy Held Erroneous as Conflicting.*

   In a trial on an indictment for murder committed as the result of and in pursuance of a criminal conspiracy between defendant and his co-indictees; it is error to instruct the jury that they may find defendant guilty of murder in the first degree if they believe beyond a reasonable doubt that the killing was in pursuance of a criminal conspiracy between the parties indicted; and then, to give another instruction on behalf of defendant, telling the jury that he is not being tried on the charge of conspiracy in the indictment, and they cannot find him guilty of the substantive offense of entering into a conspiracy as charged. Instructions must not be conflicting.     (p. 144).

5   HOMICIDE—*Instruction as to Deadly Weapon Held Erroneous Where no Evidence That Such Weapon Was Used.*

An instruction in a trial for murder telling the jury that they may find defendant guilty of murder if they find that the blows which produced death were dealt by the prisoner with a dangerous and deadly weapon, and without provocation or upon very slight provocation, is erroneous where there is no evidence that a dangerous or deadly weapon was used. There must be some evidence on which to base an instruction; a mere surmise is no basis.   (p. 145).

6.   SAME—*When Malicious Intent to Kill Cannot be Presumed From Striking With Fists Stated.*

A malicious intent to kill cannot be presumed from the striking of a full grown person on the head with the bare fists by a person of small stature and mediocre strength, although death results; unless the assault is so vicious, continued, deadly and barbaric, and under such circumstances, that malice can be implied.   (p. 145).

Error to Circuit Court, Harrison County.

Paul Roush was convicted of murder in the second degree, and he brings error.

*Reversed.*

*W. C. McKean, Melvin G. Sperry* and *Clarence B. Sperry,* for plaintiff in error.

*E. T. England,* Attorney General, and *R. A. Blessing,* Assistant Attorney General, for the State.

LIVELY, JUDGE:

The verdict is murder in the second degree on which a sentence of ten years imprisonment is based; to this judgment and sentence defendant prosecutes this writ.

The case has some remarkable aspects, and it is difficult to conjecture why the verdict was murder in the second degree. The indictment is against defendant Paul Roush, Howard Crummit, James Betts and Arthur Vannort, and charges them with combining and conspiring together for the purpose of inflicting bodily injury upon Wheeler Sanders, the deceased, and that in pursuance of the conspiracy they did, on

the ———— day of May, 1921, willfully, maliciously, etc., kill and murder Wheeler Sanders. Crummit, Betts and Vannort elected to be tried separately;.Roush was tried upon his plea of not guilty, with the result above set out.

The deceased, Wheeler Sanders, came to Clarksburg on the 9th of May, 1921, for the purpose of entering into some music business with Frank Hayes who played the piano at moving picture theatres and incidentally did some "bootlegging." Sanders was thirty-two years old, five feet nine and a half inches high and weighed two hundred and forty-seven pounds and was very strong physically. He and Hayes, about 11 o'clock that night, registered at the New Olympia Hotel, a place of questionable resort. It seems that liquor was vended there, and the resort was used for assignation purposes. They were both drinking red liquor and moonshine liquor, and consumed as much as four pints between themselves and others who were examined as witnesses. After registering they went to several places in the town that night, and at one or two of them Sanders wanted to wrestle with some of the witnesses, whom he met. They returned to the hotel about 4 o'clock A. M. when Sanders laid down on the bed with his clothes on and went into a doze. Hayes did not retire, but went down into the lobby and elsewhere about the building. Roush, with Howard Crummit, James Betts and Arthur Vannort, had been together that night in town and about 5 o'clock A. M. came by the hotel when Crummit suggested they would go to his room on the first floor which he occupied for a day, and obtain liquor. They did so, and purchased two pints which they proceeded to drink. A few minutes after they arrived Fred Waldo joined them. Hayes met one of the party who was obtaining water from the clerk, made his acquaintance and was invited into their room to take a drink. He went. Upon invitation Roush went with Hayes up to the room occupied by Hayes and Sanders on the second floor, where Sanders was awakened from his stupor, when he caught Roush and threw him on the bed in a friendly spirit, being much the superior in physical strength. Roush weighed one hundred and thirty-five pounds, was twenty-one years old, and his left arm was stiffened and almost useless as the result of a rail-

way accident some years previous, and his right arm above
the elbow had been crushed in that wreck. One of his com-
panions, Crummit, came in the room, and he also engaged
with Sanders in a friendly wrestle. Afterwards, Roush,
Hayes, Sanders and Crummit went down stairs to the other
room where they all partook of what remained of the liquor
at that place. Sanders had a badge on which was the legend
''Special Officer'', and he was named by the members of the
party ''the Sheriff''. The wrestling in the upper room was
in some way mentioned, and thereupon Sanders and Betts en-
tered into a wrestling bee, but were stopped because of the
fuss they were making, by the clerk or night porter who was
then closing his books for the night. It was then after day-
light, and Roush and his friends concluded to go to their re-
spective homes. We have examined the testimony, of the
witnesses to ascertain if any ill feeling was engendered or
could be presumed by the occurrences at the New Olympia
Hotel between Sanders and Roush or any of his companions.
We fail to find the slightest trace thereof. The wrestling and
drinking were all in a friendly spirit. It was a gathering to-
gether of kindred spirits for the purpose of convivial drink-
ing. Liquor was the assembling factor. It appears that
Sanders was a stranger to all of them, and possibly Hayes
was a stranger to most of them. They were all having a
friendly drinking bout and were making a night of it. The
vast preponderance of evidence is · that Sanders was very
much intoxicated and hilarious and that his penchant in that
condition was for wrestling. It appears that Sanders left the
hotel first and was going down Fourth street a short dis-
tance from the hotel when the others came out on the street
accompanied by Hayes. Roush remarked ''There goes the
Sheriff, he threw me upstairs, but I am going down and
throw him.'' One of his companions told him not to be
wrestling on the street as he would be arrested by the police;
another said to him, ''Go on and we will see the fun.'' He
immediately left his companions and overtook Sanders, who
turned when he approached him. Roush says there was an
expression or look in Sanders' face which scared him, and he
immediately struck Sanders with his fist two light blows on
the cheek bone. His weight, age and physical incapacity by

reason of the railway wreck has been noted. When he struck
Sanders the latter appeared to stagggger, and sank down on the
street or pavement near an ice truck. George Berry, a dis-
interested witness, who came along on the opposite side of the
street, says Sanders caught hold of the end of the gate of the
wagon or ice truck standing near by and went down very
slowly just like he was laying down. To about the same
effect is the testimony of H. S. Brown, a railroad conductor,
who says he saw him when about two or three feet from the
ground and it looked as if he was laying down. The others
came up, and Roush called to some of them to get him from
under the ice truck as it might run over him. Crummit ap-
proached him, kicked him lightly, but Sanders did not arise,
and they all began to be alarmed at his condition. Ice was
taken from the truck and put on his head, and his clothing
was opened and he appeared to be in a serious condition, and
in a very few minutes expired. Roush had walked on away
toward his home, but observing an ambulance going in the
direction of his companions he walked back. The body had
been removed when he got there, and he was arrested by the
police at that point.

An autopsy was made by the coroner, Dr. Matheny, who had
several years practice as a physician but who had not much
experience in surgery, and none in brain surgery. It dis-
closed that death had resulted from a large blood clot near
the base of the brain. There was no blood on the exterior
surface of the brain, no bleeding from any exterior membrane
in the interior of the skull. There was no sign of congestion.
The interior was natural and showed no apparent cause for
the hemorrhage. A small blood vessel inside the brain near
the base of the skull in what is called the medulla pons was
ruptured and this caused the blood clot and consequent death.
On the back of the head near the center of the skull and well
above the interior blood clot there was a small contusion
or discoloration of the skin, the doctor said, about the size
of a quarter. There was no abrasion of the skin on the out-
side, and this small bruise could only be ascertained by the
discoloration inside of the skin where it joined the skull.
The skull was not hurt. It was manifest that this contusion
was of an inconsequent nature. The doctor said it looked as

if it had been caused by some blunt instrument, but said that it could have resulted from the head striking the truck or the pavement when he went down. There was not the slightest congestion on the inside of the skull immediately opposite this slight abrasion, which could only be noticed by the doctor after the scalp had been removed from the skull. The doctor was not experienced in brain surgery and had done but little general surgical work. Dr. Owens was present and helped Dr. Matheny make the autopsy, but he was not examined as a witness. The heart, lungs and other vital organs were in good condition. The doctor was asked what produced the hemorrhage of the brain, and replied ''That is a pretty hard question to answer exactly, because there is various conditions that could produce the same hemorrhage. It might likely would be chromotimi or bruise.'' The doctor expressed the opinion that Sanders did not die from alcoholism, but that the hemorrhage was due to some ''traumatism'' which he said was caused by ''being struck a blow, in a way, with a blunt instrument.'' The only evidence of any blow was the small bruise on the back of the head heretofore detailed, which the doctor said showed little discoloration and no laceration, simply a bruise; and he testified on cross examination that if a small baby should strike its head on a pavement lightly it would cause the same kind of a bruise. It appears also that there was a slight discoloration of the skin on Sanders' cheek or jaw. From their description they were minor and unimportant. Upon these physical facts this witness testified as follows:

> ''122 Q. I will ask you whether or not the ordinary blows that a boy of that weight could strike a man of the size of Sanders on his cheek or jaw, and producing no more discoloration than you saw there, would in any probability cause the death of Sanders?
>
> A. I would be bound to say yes.
>
> 123 Q. In other words a blow that would scarcely discolor the cheek would probably cause death?
>
> A. Yes sir, would probably cause death.
>
> 124 Q. And if in a fist fight you saw a man marked that way you would think he would probably die from that mark, would you?
>
> A. Ordinarily he would not, but probably he would.

125 Q.   That would ordinarily cause the death?   In any probability would it ordinarily cause the death?

A.   Yes sir.

126 Q.   And that is given as your judgment as a medical expert, is it?

A.   I am not testifying as a medical expert.

127 Q.   Do you mean to tell the jury, Doctor, that the probable result of a blow that would not abraise the skin of your face, 'would not draw blood on your cheek, if struck on your jaw would be death?

A.   It would not necessarily be death, but it could probably be.

128 Q.   I asked you if the probable result would be death.

A.   If I understand your question right those things are not impossible, such things could be possible, not probable, but possible.

129 Q.   But your answers have been to the effect that they were the probable results, and you did not mean that, did you?

A.   If I answered in that way that is not what I meant.   The question was not read then correct, or I did not grasp it as it was read.

130 Q.   Doctor, you never saw an ordinary fist fight between two people when the effects of the blows were of that small appearance on the jaw, did you.

A.   Yes sir.

131 Q.   And they did not result in death, did they?

A.   Not always, no sir.

132 Q.   And if you were called in to treat a man who had been hit hard enough not even to abraise the skin on the jaw or to color or black his eye, you would not expect him to die from that, would you?

A.   No sir, I would not expect him to.

133 Q.   Now Doctor, to be perfectly frank, if a man with that kind of a mark on him did die from some cause, would you hunt for another cause?

A.   Yes, I would hunt for another cause.

134 Q.   You would not want to accept that one as probable, would you?

A.   I am not accepting it as probable.''

This witness said that when he examined the brain it was just as natural and apparently without any injury as if the man had died of apoplexy when sitting in his chair.   He also stated that he was present when Dr. Cherry examined the stomach, and he did not discover that there was any alcohol

therein. Dr. Cherry was not examined. It is apparent from a close inspection of Dr. Matheny's testimony that what he intended to say was that the blow on the jaw or cheek or the blow which caused the slight bruise of the inside of the skin on the back of the head might probably have been the cause of the rupture of the small blood vessel at the base of the brain near where the spinal cord joins it. There was evidence from Hayes that Roush struck Sanders on the back of the head, and "Sanders fell backwards and seemed to go down, just weakening like, just went down." Numerous other witnesses said the blows were at Sanders' face. Hayes also said that when he came up with the others to where Sanders was lying, Roush attempted to hit him (Hayes) with his fist, and one of the others did actually hit him, and he immediately left.

On this evidence the jury evidently came to the conclusion that the blow from Roush's fist caused the death, and that the blow was delivered with a malicious intent to do great bodily harm.

There are numerous assignments of error relating to the introduction and refusal of evidence, giving and refusing instructions, and to the refusal of the court to set aside the verdict as contrary to the law and evidence. Defendant, by counsel, urges: (1) that the evidence was not sufficient to establish the corpus delicti, that it fails to prove beyond a mere suspicion or remote probability that the blows caused the death; (2) that assuming that the blows did cause the hemorrhage at the base of the brain, then malice either express or implied is not warranted, and that defendant could not be guilty of an offense higher than involuntary manslaughter.

These two points of error, together with error in the instructions, are the main ones relied upon, the others being collateral thereto, or technical. Let us consider if these assignments are well taken. Was the evidence sufficient to establish beyond a reasonable doubt the conclusion that the blows from Roush's fist caused the death of Sanders? Was there a homicide? The character of the discolorations on the face and rear scalp is such as to impel the conclusion that

the blows were of slight force.   The physical impairment of
defendant's arm, his small stature and light weight buttress
the conclusion.   The evidence that the blows were delivered
on the cheek bone or jaw, and not on the back of the head,
largely preponderates.   The peculiar feature of the case is
why Roush struck the blows at all.   There was no evidence of
a quarrel or of ill feeling, no apparent motive for the blows.
His explanation is that when Sanders turned, the look or
expression on his face was such that it scared him and he
involuntarily hit him.   Both had been drinking questionable
liquors.   And while the unexpected often happens, it may
be conceded that the blows under the circumstances are not
what would be expected, from a prudent man, and that the
explanation is unusual and puzzling.   The difference in size
and strength of the two men was very great.   The blows
ordinarily would be of trifling effect.   The discoloration of the
inside of the skin designated as being about the size of a
quarter (of a dollar) evidenced less force than the discolora-
tions on the face.   It was discernible only after the scalp had
been removed.   The skin was not abraided on the outside and
no injury to the skull or the inside delicate membrane im-
mediately opposite the discolored spot on the skin.   The
physician said it had the appearance of having been caused
by some blunt instrument; but that it could have been caused
by the head striking some solid substance, and that a like dis-
coloration often resulted where a child in its infantile ef-
forts to learn to walk should bump its head on the floor.
There was not the slightest evidence that Roush used a blunt
instrument nor any dangerous or deadly weapon, although
that theory was impressed upon the jury by instructions,
hereafter to be discussed, telling them it was solely within
their province to conclude whether a dangerous and deadly
weapon was used which produced these discolorations.

A close analysis of the evidence of the physician who made
the autopsy, in the light of his confessed inexperience, will
reveal that while he expressed the opinion that the blood
clot resulted from traumatism which he defined as "being
struck a blow; it is a blow in a way with a blunt instrument,"
yet he says the blows with the fists from a boy of the size

and strength of Roush upon the deceased producing a mere discoloration and not even a "black eye" from the discoloration on the cheek bone, would possibly cause death, but not probably. At first, he said it would "probably" cause death, but afterwards modified that statement. Nowhere does he say that these blows were the cause of the death. The most that can be said of his evidence is that they might possibly have so resulted. He also says the inside of the skull was normal, except for the blood clot, and would be the same, present the same appearance, if the blood clot had been caused by apoplexy. He did not profess to know all the evidences of alcoholic poisoning; but was of the opinion that his death did not result from the use of alcohol; he saw or smelled no alcohol when the stomach was examined by another physician. He was present at the examination of the stomach. The evidence of the physician who analyzed the contents of the stomach was not taken. Whether there were evidences of alcohol in the stomach or not, it is proved by the great preponderance of the evidence that the deceased the night before had imbibed much red and moonshine liquor and was intoxicated to the extent that he staggered and had to be led by his companions. The alcohol was in his system if not in his stomach. It is well established in medical science that the excessive imbibing of alcohol often causes apoplexy.

The evidence fails to establish beyond a reasonable doubt that these blows, producing such slight evidence of force or effect on the skin, caused the breaking of the blood vessel at the base of the brain. The jury has evidently concluded otherwise, possibly being misled by the colorings in the doctor's cloudy expert testimony. The supposed use of a blunt instrument, a dangerous and deadly weapon in the hands of Roush, and upon which instructions were based, may also have brought about this unwarranted finding. Shall it stand? We are not unmindful of the rule that a verdict cannot be disturbed where the evidence is sufficiently conflicting to warrant difference of opinion; that the jury may make reasonable inferences from facts well established; and that the weight of evidence and credibility of witnesses is peculiarly within their keeping and finding. However, on the

point here under discussion, the evidence is not materially conflicting. It does not clearly establish the corpus delicti, a point most essential to conviction. To find that death resulted from the blows conclusively, the jury must have found that a dangerous and deadly weapon was used; a finding not justified by the evidence. The text books and decisions are all in accord that the corpus delicti must be established by clear, full and convincing evidence. Wharton Crim. Ev. sec. 633; *Johnson* v. *Commonwealth,* 29 Grat. 811; *State* v. *Flanagan,* 26 W. Va. 117; *State* v. *Hall,* 31 W. Va. 509; *State* v. *Parsons,* 39 W. Va. 466; *State* v. *Merrill,* 72 W. Va. 500; *Goldman* v. *Com.,* 100 Va. 625; *Smith* v. *Com.,* 21 Grat. 809; *Gray* v. *Com.,* 101 Pa. St. 380; *Com.* v. *York,* 9 Metcalf 93. The rule requiring the fullness of proof required is well stated in the 6th pt. Syl. in *State* v. *Flanagan,* 26 W. Va. as follows: "It is a fundamental and inflexible rule of legal procedure, of universal obligation, that no person shall be required to answer or be involved in the consequences of guilt without satisfactory proof of the *corpus delicti* either by direct evidence or by cogent and irresistible grounds of presumption." Giving full faith and credit to the testimony and especially to the evidence of the medical expert, Dr. Matheny, (which is far from conclusive), we are of opinion that it is insufficient to exclude the hypothesis that Sanders' death was superinduced by causes other than the blows on his face. It is against experience and common sense to conclude beyond a reasonable doubt that these slight blows were the sole cause of the sinking down of a man of his physical prowess. He went down as if he was laying down, or "easing himself down" as the witnesses said. The blows were immediately preceding the hemorrhage of the brain, and this circumstance tends to show cause and effect; but not necessarily so, and not beyond the peradventure of a doubt. And the most that can be said of the physician's testimony is that the blows might possibly have produced the blood clot. His evidence is not of that positive character on which life or liberty can be legally taken. It is upon his evidence that proof of the *corpus delicti* largely rests. We are not quick to disturb verdicts in such cases, but where full and clear evidence is lacking, coupled with the fact that the jury may have been influenced by faulty in-

structions, we cannot retreat behind the sanctity of a verdict and hold it up as a shield to protect our conscience.

Presuming that the blows caused the death, we come to the question of malice which may be discussed together with the instructions. The difference between murder and manslaughter is that manslaughter (where voluntary) arises from the sudden heat of passion, while murder is from the wickedness of the heart. Malice aforethought distinguishes murder from other homicides. 41 Bl. Com. 198. *Prima facie* all homicide is murder in the second degree, and is in presumption of law malicious; wherefore, the burden is on the defendant to show alleviation, excuse or justification. It may be shown by the evidence and cricumstances, introduced by either side. The presumption of malice which makes the homicide murder, may be rebutted by the accused or by the state, even where the act though intentional of death was not the result of deliberation and premeditation; as when death is the result of sudden heat of passion and hot blood, if upon reasonable provocation and without malice. Has the legal presumption of malice been successfully repelled by the facts and circumstances of this case?

It will be noted that indictment is under the Red Men's Act, secs. 9 and 10, chap. 148, Code. And the theory of the state at the inception was that the assault by Roush with his fists was a result of the conspiracy, and therefore defendant was guilty of murder in the first degree under the act. It is stated in the brief that at the conclusion of the evidence the state abandoned the conspiracy charge, and relied upon the indictment as for murder under sec. 1, chap. 144, Code. This alleged abandonment was not made a matter of record; although the court instructed the jury (defendant's instruction 13-a) that defendant was not being tried upon the charge of conspiracy as a substantive offense created by secs. 9 and 10, chap. 148, Code, and that they could not find him guilty of the substantive offense of entering into a conspiracy. The verdict relieves defendant of the conspiracy, else it would likely have been for murder in the first degree. But we note that state's instruction No. 1 tells the jury that Roush and his co-indictees are charged with a conspiracy to inflict bodily

punishment on Sanders, and that they did, in pursuance of the conspiracy, murder him. It then defines a conspiracy and tells the jury all are guilty if one of them does an unlawful act in pursuance of the combination and conspiracy. It further tells them that if they believe beyond a reasonable doubt that these persons did combine and conspire to inflict bodily punishment on Sanders, and that in pursuance thereof Roush did inflict bodily injury upon Sanders by striking him, and that death was the direct result of the blow inflicted in pursuance of the conspiracy, then they may find defendant guilty of murder in the first degree as charged. Defendant's instruction No. 13-a tells the jury that they cannot find defendant guilty of the substantive offense of entering into a conspiracy. How can these two instructions be reconciled? As before stated, the jury must have found that there was no conspiracy, else the verdict would have been first degree murder. Indeed there was no evidence on which a verdict for conspiracy could stand. What effect these two conflicting instructions may have had in the rendition of the verdict is hard to determine. It is elementary that conflicting instructions should not be given. They are calculated to confuse and mislead the jury.

State's instruction No. 2 told the jury that although the state carried the burden to show, in cases of homicide, that the killing was done maliciously, yet whenever the killing is wilful, deliberate and premeditated, the law infers malice from the act done, and if they believed beyond a reasonable doubt that Roush killed Sanders wilfully, deliberately and premeditatedly, the law infers malice, and they might find defendant guilty as charged. This instruction was clearly prejudicial. It had no justification under the evidence and circumstances. There was no wilful, deliberate premeditation shown. Malice can not be inferred from the result of an act alone. If so, an accidental killing would be malicious. The act itself, the manner, means and circumstances under which it is done must warrant the inference of malice, and not the result of the act alone.

The same can be said of state's instruction No. 3, which

tells the jury that they are the sole judges of the fact whether
defendant struck Sanders with a dangerous and deadly
weapon, and if they believed so beyond a reasonable doubt,
and that death ensued therefrom, then the presumption of
law is that Roush intended the necessary consequences of his
act; and if they believed that he inflicted the wound without
any or upon very slight provocation then defendant was
*prima facie* guilty of wilful, deliberate and premeditated
killing, and they might find him guilty of murder in the first
degree. There is not the slightest evidence that Roush struck
Sanders with a dangerous or deadly weapon. No one pre-
tends to say that he saw any weapon except the fist. The
bare fist is not a dangerous and deadly weapon as defined by
the law. The slight discolorations on the inside of the scalp
and on the cheek bone did not justify the assumption that
they were the result of a dangerous and deadly weapon in
defendant's hands. It is true that the jury did not so find,
as indicated by the verdict; but we think defendant was
highly prejudiced by telling them they could find a verdict
of first degree murder, on the theory of the use of a deadly
weapon. Malice is presumed from the use of a deadly weapon,
but a malicious intent to kill or inflict great bodily harm can
not be presumed from the striking with the bare fists in the
manner disclosed by this record. No motive was apparent.
Conceding that the blows were the immediate and sole factor
in producing the hemorrhage at the base of the brain, this
result can not be said to be intentional, or the reasonable,
necessary consequence of the act. A man is presumed to in-
tend that which he does, and which is the immediate or neces-
sary consequence of his act. The improbable or remotely
possible consequences can not be presumed. *People* v. *Munn,*
65 Cal. 211; *Com.* v. *Webster,* 5 Cush. 305; *Wheeler* v. *Peo-
ple,* 36 Mich. 16; *People* v. *Denomme,* 56 Pac. 98; *Smith* v.
*State,* 33 Me. 55. The bare fists are not regarded as dangerous
and deadly weapons; but there are instances where their
vicious, deadly and barbaric use has warranted the deduction
of malicious intent. *McWhirt's Case,* 3 Grat. 594; *People* v.
*Denomme,* 123 Cal. 227, 56 Pac. 98; *People* v. *Munn,* cited

is illuminating on the instruction under consideration; and under what circumstances malice can be implied. In *People v. Crenshaw*, 298 Ill. 412, 131 N. E. 576, the court said: "No inference of an intent to kill is warranted from the striking of a person on the head with the fist, although death results, so as to constitute murder. Although one is presumed to have intended the reasonable and probable consequences of his act, intent to kill can not be presumed from striking one with the fist, although death results, if such result was not a probable consequence of the act." To the same effect is the case of *McAndrews* v. *People*, 71 Colo. 542. In our recent case of *State* v. *Hurst*, 93 W. Va. 222, the homicide was committed by the use of a knife, a dangerous and deadly weapon, but the circumstances under which the act was committed did not warrant presumption of malice, and the giving of an instruction telling the jury it might find defendant guilty of first or second degree murder, was held to be erroneous. Judge MEREDITH, after reviewing the evidence, said it failed to disclose legal malice.

By state's instruction No. 6 the jury was told that whoever kills a human being with malice aforethought is guilty of murder; and that murder which is perpetrated by poison, lying in wait or any other kind of wilful, deliberate and premeditated killing, is murder in the first degree. This instruction is abstract, and while not objectionable as a correct enunciation of an abstract proposition of law, when taken and considered with the instructions above considered, and with instruction No. 7 for the state, it is manifest that the court was unduly impressing upon the jury the crime of first degree murder; a wilful, deliberate and premeditated killing with a dangerous and deadly weapon. Instruction No. 7, just referred to, told the jury that if they believed defendant struck Sanders a blow with a dangerous and deadly weapon thereby killing him, the intent, malice, wilfulness, deliberation and premeditation necessary to constitute murder may be inferred from the act. What impression these instructions may have made on the minds of the jurors is, of course, a matter of conjecture. Why impress on the jury the inference of

law to be drawn from the use of a dangerous and deadly weapon, when none was used? What influence did they have on the jury? Does the verdict reflect the influence of these instructions? It is hard to answer. We think it can be reasonably presumed that they were prejudicial.

The theory of the defense was that the blows struck by Roush were not the cause of the death; that the blood clot was the result of the excessive use of poisonous liquors, bringing about apoplexy. Instruction No. 28, offered by defendant, and refused, would have told the jury, if given, that it was not sufficient for them to surmise that the licks struck by Roush might or possibly or probably did result in the death, but that they must believe from all the evidence beyond a reasonable doubt, that the death was the actual result of the blows, before they could find defendant guilty of involuntary manslaughter. There could be no crime charged to defendant unless the death resulted from his act, not even involuntary manslaughter, much less any higher degree of crime. The instruction correctly states the law applicable to the facts proven. It went to the very heart of the case, and should have been given.

We do not think the assignments of error, relating to the giving and refusing of evidence offered and objected to are of importance, and they will not be discussed.

The judgment will be reversed, the verdict set aside and a new trial awarded.

*Reversed; verdict set aside; new trial awarded.*