# CHARLESTON.

### STATE *v.* CHESTER GILFILLEN.

Submitted June 6, 1924.     Decided June 16, 1924.

1. HOMICIDE—*Corpus Delicti Must be Established Beyond Reasonable Doubt, to Sustain Conviction of Murder.*

    In order to sustain a conviction of murder, the corpus delicti must be established beyond a reasonable doubt. (p. 665).

2.   SAME—*Defendant's Agency in Commission of Crime Must be Established Beyond Reasonable Doubt.*

And if the corpus delicti be so established, yet in order to convict, the evidence of defendant's agency in the commission of the crime must be so clear and convincing as to exclude every reasonable hypothesis of any and all other causes. It must beyond a reasonable doubt show that the defendant is the guilty agent. (p. 665).

MILLER, JUDGE, absent.

Error to Circuit Court, Cabell County.

Chester Gilfillen was convicted of murder in the second degree, and he brings error.

*Reversed; verdict set aside; new trial awarded.*

*C. E. Copen* and *S. Moore,* for plaintiff in error.

MEREDITH, PRESIDENT:

Chester Gilfillen and Clarence Roberts were jointly indicted for the murder of Dial Hager. Gilfillen, the defendant here, elected to be tried separately. On the first trial the jury disagreed; on a second trial he was found guilty of murder in the second degree, and was sentenced to imprisonment for eighteen years. Roberts does not appear to have been brought to trial.

No instructions were given. The main ground relied on, and which is decisive of the case, is that the verdict is contrary to the law and the evidence. The deceased, Dial Hager, was the owner and operator of a taxi-cab. On August 24, 1922, he was engaged by Nathan Green to take him and a woman named Lottie Fish for a night drive up the Ohio River Road from Huntington. Green, who had been employed at Russell, Kentucky, as a railroad strike-breaker, had arrived in Huntington but about two days before. During his short stay there he had visited various questionable resorts and had become acquainted with Gilfillen and Mrs. Fish. About the time of starting, Green asked Gilfillen where he could get some whiskey. They had procured some on that or the previous day. Their starting point was near Twentieth Street. Hager's taxi-cab was then on the side

of the street; there were in it, Green, Mrs. Fish, Clarence
Roberts and Hager. Gilfillen informed Green he thought he
knew where the whiskey could be found; Green handed him
$5.00 to pay for the whiskey and Gilfillen crossed the street
to another car operated by Bias; he told Bias what he wanted
and was told to get in the car. Gilfillen went back to the
Hager car, told Green to follow the other car, returned to
the Bias car, got in and both cars started up the river road,
the Hager car in the rear. They stopped near a gasoline
station just above Guyandotte. Bias went over toward the
Ohio River and after some time returned with two pint bot-
tles of "moonshine", which he handed to some one in the
Hager car. Gilfillen paid him, then got in the front seat of
the Hager car, with Hager and Roberts. Green and Mrs.
Fish were in the rear seat. The party in the Hager car
started up the river, Roberts driving. All of the members
of the party drank of the "moonshine" except Mrs. Fish.
She says she drank no "moonshine", though she pretended
to the party to do so, but did drink some pop which they
had procured while waiting for the whiskey. They drove on
for about five miles. It became apparent that Roberts was
too drunk to drive safely; Mrs. Fish became frightened and
made complaint. They turned around and drove back some
distance and stopped. We think it is clear that all the men
were then under the influence of liquor, and particularly
Roberts and Gilfillen. Hager told Roberts, who was his
nephew, to get out and crank the car. Roberts got out and
started toward the front of the car. Gilfillen began curs-
ing, saying that he would kill any one who touched the car,
or tried to stop another car or to use the telephone. About
that time all the others got out and Green and Mrs. Fish
started walking down the road. Gilfillen followed, about two
steps behind. As they walked along some one started the
car, and as it passed, Mrs. Fish called out to Clarence Rob-
erts, thinking that he was the driver. The driver made no
answer, nor did he stop. The witnesses identify this as the car
they had been in from the fact that it had but one light.
After following Green and Mrs. Fish about twenty-five
yards, Gilfillen, cursing most of the way, said to Green, "You
know the game when they bring you out like this." To this

Green replied, ''What kind of a game are you talking about''?
He then gave Gilfillen a push with his hand, said ''To Hell
with the whole damn mess with you'', and ran down the
road, leaving Mrs. Fish and Gilfillen standing in the road.
Green came to the home of E. P. Dunkle, about a hundred
yards from where the car had stopped, and found that he
had just got home with his family from Huntington. He
asked Mr. Dunkle if he could keep him for the night, after
telling him the trouble he was in, or if not, then take him
to Huntington. Mr. Dunkle immediately took him to Hunt-
ington. On the way down, about two hundred yards below
the Dunkle home, they passed the Hager car, which was then
standing on the side of the road. Mr. Dunkle had passed it
on the way up, but it was then near the center of the road.
It appears that between these two trips a truck or other
car had come along and pushed the Hager car over to the
side of the road. On both occasions Mr. Dunkle saw a man
in the car, and also as he made his return trip from Hunt-
ington. The man in the car in all probability was Roberts.
No one examined the car and no one could tell anything
about the movements of Hager. The last time he was seen
alive was when he got out of the car with the other members
of the party. Gilfillen and Mrs. Fish went over the bank
where they remained about half an hour. She then hailed
a passing automobile and was taken into Huntington. Be-
tween six and seven o'clock the next morning as John Hall,
a dairy-man, was driving to Huntington, Gilfillen and Rob-
erts hailed him from the Hager car and asked him to bring
them to Huntington. They got in the rear seat and he
brought them in. They were both wet. It had rained that
night. One of them, but witness Hall did not know which
one, said ''When I woke up at 2 o''clock this morning I was
lying there on the Ohio River bank in the horse weeds about
fifteen feet tall. I am drowned.'' Hall testified that one of
them had a bruise or scratch extending from his collar bone
down across his chest; that he said ''I must have had a
hell of a fight last night. I am skinned up and bruised all
over.'' Hall could not say which one was bruised or which
one made the remark.

As already stated, Hager was last seen alive when the party got out of the car. Roberts, a witness for the state, remembers nothing except that all of them got out of the car and that he began "fooling" with the carburetor. He does not recall when he got in again,—nothing until the next morning, between six and seven o'clock, when Gilfillen found him in the car and woke him up; that he and Gilfillen came to Huntington with some farmer.

On Saturday morning the body of Hager was found about a mile and a half below where his car had stopped the previous Thursday night. The body was in the Ohio River, a few feet from the shore, tied with a rope. Dr. Gerlach, the coroner, was called and he made an examination of the body. He says the body had been caught in the river, but by whom or under what circumstances is not disclosed. It was tied up near a house-boat. There was a considerable rise in the river, a five or ten foot stage. The body was clothed, and there were in his clothes some keys, about two dollars in silver coin, a watch, a bill-folder, some papers and receipts. There were some scratches under his chin, on his throat and arm, and a cut about three fourths of an inch long over the right temple. Dr. Gerlach testified that this was superficial and that it only went through the outer layer of skin. It indicated some slight inflammation; there were no wounds on the body that could cause death and his opinion was that deceased was drowned. He found no other evidence of the cause of death. It does not appear that he made any examination of the lungs of deceased. The father-in-law of deceased and an Italian by the name of Terzoglio testified that after the body had been prepared for burial at the undertaker's rooms and taken to the Hager home they examined the head and found two wounds, one in the temple and another in the back of the head near the base of the skull; that one of these indicated that the skull was crushed, and the other looked like it had been made by a bullet. There is some testimony to the effect that when defendant got to Huntington he remarked that he had been in a fight up the river. It appears from the testimony of officers Altizer and Midkiff that on Sunday following the discovery of the body they had some one point out the places where the Hager

car had stopped. They found a trail leading over the river bank into a corn field; this appears to have started somewhere near where the car made its last stop. They say the trail appeared as if it had been made by the dragging of a bag. There were some tracks in the corn field which led toward the river. This testimony is very indefinite; there is nothing to indicate when these tracks were made, nor where they ended, nor whose they were. It does not appear that there were any signs on the body or clothing indicating that the body had been dragged any distance.

We have detailed substantially all the facts shown. Defendant testified in his own behalf. He tells nothing that throws any light on the matter. He remembers that he got out of the car, started down the road, and fell over the bank into a hole, where he woke up the next morning.

Is the evidence sufficient to support the verdict? We think not, and for two reasons: (1) It is not shown that Hager came to his death through the wilful, criminal act of any human agent; and (2) had that been shown, it has not been shown beyond a reasonable doubt that Gilfillen was that agent. The state has filed no brief, but we infer from the testimony that the state relied on robbery as a motive. If so, that is not established. While it is shown that deceased had twenty-five or thirty dollars on him about three o'clock Thursday afternoon, no one knows what he had when he started up the river Thursday night. The finding of his watch and some money on the body tends to rebut the theory of robbery. Gilfillen and Hager were friends and had been such for eight or nine years. They had worked together and there is not a word in the case tending to show there was any ill feeling between them.

It can not be said beyond a reasonable doubt that a criminal agent caused the death of Hager; and were that proved it has not been shown that defendant did it.

"In order to sustain a conviction for the commission of crime, the corpus delicti must be established beyond any reasonable doubt by evidence, or by cogent and irresistible grounds of presumption. The evidence of defendant's agency in the commission of the supposed crime must be so clear and convincing as to exclude any reasonable hypothesis of other

causes." *State* .v. *Roush,* 95 W. Va. 132, 120 S. E. 304; *State* v. *Dudley,* decided this present term, *State* v. *Zinn,* 95 W. Va. 148, 120 S. E. 387.

Defendant's motion to direct a verdict in his favor, made at the close of the state's evidence, should have been sustained.

The judgment will be reversed, the verdict set aside and defendant awarded a new trial.

*Reversed; verdict set aside; new trial awarded.*