# CHARLESTON.

STATE v. ANNA L. McKENZIE

(No. 6441)

Submitted November 6, 1929. Decided November 19, 1929.

*W. S. Wysong* and *W. R. Orfutt,* for plaintiff in error.
*Howard B. Lee,* Attorney General, and *R. A. Blessing,* Assistant Attorney General, for the State.

LIVELY, JUDGE:

The defendant, Anna L. McKenzie, was jointly indicted with one Seymour Smith for the murder of Thomas McKenzie, the defendant's husband. Mrs. McKenzie was tried separately, found guilty of murder in the first degree, and was sentenced to life imprisonment. Smith was tried at a later date and was found guilty of second degree murder.

The controlling question in this case is raised by the assignment of error that the verdict of the jury is contrary to the law and the evidence. This necessitates a detailed statement of the facts. The evidence is entirely circumstantial. The defendant, a woman 43 years of age, and Thomas McKenzie, the deceased, about 55, had been married for over 19 years and were the parents of nine children ranging in ages from eighteen months to eighteen years. They had originally lived in Maryland, but shortly after their marriage they moved to West Virginia, where the husband, a lumber contractor, engaged in that work in various lumber camps. The defendant acted as his camp cook. A number of years before the death of McKenzie, they had purchased and moved to a farm of about 200 acres situated seven miles from Webster Springs, subsequent to which, McKenzie devoted part of his time to the farm, and part to lumber operations on Williams River. Just a year or so before his death, he had borrowed money to build a new residence on the farm, which was almost com-

pleted by the fall of 1927. The family cooked and ate their meals in the old house which was within a few feet of the new one, but slept in the new residence.

During the latter part of September, 1927, while McKenzie was working temporarily at a lumber operation on Williams River, a message was sent to him through Smith, co-indictee of the defendant, requesting that he return home to execute a paper necessary to secure defendant's participation in her father's estate in Maryland. In compliance with this request, McKenzie returned home on Tuesday, September 27, 1927. The paper was executed and acknowledged, and was sent to Maryland. McKenzie continued at home doing some needed work on the farm. On Friday, September 30, Smith, a young man about 28 years of age, who was employed as a conductor on a lumber train at Three Forks, arrived at the McKenzie home. He complained of a toothache, and declared his intention of going to Webster Springs the next day for the purpose of having the tooth extracted. Smith had for a year or more been the suitor of Ruby McKenzie, the sixteen-year-old daughter of the defendant, and made frequent week-end visits. They were engaged to be married. At the time of Smith's arrival on Friday afternoon, Mrs. McKenzie was engaged in painting a portion of the new house. She did not engage in conversation with him, but Ruby, his fiancee, greeted him and escorted him upstairs to her bedroom which was customarily occupied by Smith on his visits to the home. On these occasions, Ruby slept down stairs. Smith was apparently suffering severe pain, and after talking with him a few moments, Ruby left the room and continued with her household tasks. McKenzie was absent from the house at this time. Smith fell asleep and was awakened at supper time when he joined the family for that meal. He partook rather lightly of the evening meal, waited until the rest of the family had finished, and after engaging McKenzie in conversation for a half hour or more, retired to his room. In accordance with the custom of the family, they all retired rather early; on that particular night, about nine o'clock. No one was present at the house that night except Smith and the members of the

McKenzie family. Smith occupied the room directly at the head of the stairs, McKenzie occupied a room near Smith's room and the defendant a room farther down the hall. Several of the younger boys of the family occupied another room on the same floor. Ruby and her sister, Rhoda, slept on the lower floor.

From the evidence of the defendant, it appears that she and her husband arose at 5:30 o'clock the next morning and went to the kitchen in the old house. Ruby corroborated her mother in that statement, and testified that she heard her father and mother come down the stairs. McKenzie told defendant he was going to the barn to look after the horses. After having gone a short distance he returned, and said that he did not need the lantern he was carrying as it was getting light enough for him to see without it. He set the lantern down and started again on his mission. Mrs. McKenzie busied herself with the preparation of breakfast and later called the children when the meal was ready. The testimony shows that Smith joined the family at this time and ate breakfast with them, although Smith's evidence is to the effect that he and Ruby ate breakfast alone that morning. Between seven and eight o'clock, and after breakfast was over, Smith left for Webster Springs to have his tooth extracted. McKenzie had failed to return to the house, and Smith remarked before departing that he would stay if he thought he could be of any assistance; that in all probability McKenzie would appear very shortly. McKenzie's absence did not seem to have caused great anxiety in the minds of the members of the family until about nine o'clock when the defendant became worried, and fearing that something may have happened to him, she and the children undertook to search for him. The defendant testified that McKenzie had been worrying considerably about his ability to care for the children the coming winter by reason of the debt created in the building of the new house, and had appeared very moody on numerous occasions. A search of the farm, and inquiries made at the neighbors' houses, failed to reveal any trace of McKenzie's whereabouts. Finally, about four o'clock of that afternoon, two of

the smaller children, at the mother's direction, went to a laurel grove near a cliff of rocks about three hundred or more yards from the house. Upon arriving at that place, Rhoda, a girl about twelve years of age, and one of her younger brothers, discovered her father's body hanging in an upright position in some laurel brush along the side of the cliff. The children notified their mother and took her to the father's body. Neighbors were summoned and the sheriff, the prosecuting attorney, coroner and other officials began to arrive on the scene about seven o'clock that evening. An examination revealed that the neck of the deceased was supported in the forks of two laurel bushes coming together by the side of the cliff. One hand of the deceased was grasping the laurel bush. A two-bitted ax, belonging to McKenzie, the blades and the handle of which were covered with blood, was found a short distance from the body. There was no blood upon the ground beneath the dead man. The head of the deceased was just a foot or two from the top of the cliff, his body was facing towards and resting against it. The distance from the head of the deceased to the ground was about nine feet four inches. McKenzie was about six feet three inches tall, and weighed about 180 pounds.

According to the evidence of witnesses appearing upon the scene after the discovery of the body, no one touched the ax until the arrival of the officers. About twelve o'clock that night a coroner's jury removed the body from the laurel grove and carried it to a room on the lower floor of the McKenzie house. An examination revealed that at the time of his death, McKenzie was wearing a shirt and overalls, without underwear. He had on a felt hat, and a pair of lumberman's boots which were loosely laced. There was some evidence that the condition of the hobnails in his shoes apparently indicated that they had not been recently used. Upon the removal of the hat from the head of the deceased a chestnut burr and some leaves were found on the inside thereof. There were two main wounds on the head of the deceased, one in the fore part and one in the rear. The wound on the fore part of his head was caused by numerous hacks of some sharp

instrument. These cuts corresponded to those appearing in the hat of the deceased, but the wound on the crown of the head, caused evidently by some blunt instrument, did not match any cut in the hat. The blood on the head had matted and dried. A considerable amount of blood was found on the left sleeve of the deceased and a slight amount thereof on other parts of his overalls. On one shoe there was a splotch of blood near the instep. The coroner's jury, owing to the lateness of the hour, adjourned to meet the following day at noon, when they again resumed their probe.

Smith returned to the McKenzie home on Saturday night about six o'clock. On that night county officers secured two bloodhounds owned by a deputy sheriff of the county, to aid in locating the guilty party. The bloodhounds took a scent from the handle of the ax found near the deceased and also from a heel print found just before reaching the cliff above him. They circled around to the cellar of the old McKenzie house and tried to get in, but the place was locked. Finally, they picked up the scent again and pushing their way through the crowd which had gathered at this time, proceeded up the stairs of the new house to the second floor. They went in the room said to have been occupied by McKenzie on the night of his death, came out, went to the door of Mrs. McKenzies' room and then proceeded to the room occupied by Smith, who had retired for the night. One of the dogs smelled of Smith's shoes and laid down by them. The other dog got up on his bed, pulled the cover away with his paw, and licked Smith's face. Smith was arrested and was taken into custody. As he was being removed from the house Mrs. McKenzie seemed to be greatly grieved by reason of his arrest, stating that he was just as innocent as any of them. The evidence shows that on the morning of October 1st when Smith got up his bed clothing was soaked with perspiration and had to be hung out to dry. He attributes this to the fact that he had taken eight or ten aspirin tablets to relieve the pain caused by his toothache.

The defendant, even after the body of her husband was found, had expressed the opinion that he had committed

suicide, but after making declarations to various persons in this regard, she changed her viewpoint. An examination on the next day (Sunday) of the room occupied by the deceased on the night before his death, revealed that there was a dark spot on the cardboard wall at the head of the bed, which looked as though it had been recently scrubbed. The floor of the room also bore evidence of recent cleaning. A little girl who had assisted Rhoda McKenzie in making the bed that day, stated that the only bed clothing found thereon was two pillows, a blanket and a sheet. Defendant explained this by saying that the other bed clothes were used in keeping the baby from crawling from the defendant's bed. On that day (Sunday), or the following Monday, several of the witnesses testified that they had observed small spots of blood on the floor of McKenzie's room near the washstand. About two months after the murder two of these spots of blood were cut from the floor and sent to an expert for analysis. The expert reported that the spots were human blood. Sunday one of the officers noticed that in one of the new fireplaces down stairs, some soft material had been burned. The defendant's evidence indicated that the soft material was shavings and paper. A piece of cloth bearing evidence of blood spots was found under the mattress of the bed occupied by Ruby down stairs. She explained this by saying that the spots resulted from menstruation. A spot of blood was also found about thirty feet from the house on a path leading therefrom. There was also evidence that a borrowed hatchet had disappeared from the house.

The state, by a number of witnesses, sought to establish the fact that the defendant had displayed little or no emotion on the night of the finding of her husband's body (although the children who found the body testified that their mother cried when they reported the death to her). Evidence was also introduced by the state that the defendant, after her arrest, was overheard to make the statement to a fellow prisoner that she "was going to take Smithy and run away when they got out," and the further remark "to hell with the daughter." The state introduced evidence as to previous

quarrels between the defendant and her husband occurring over six years before at which time she was said to have expressed a desire "to dance his body in the ground." This was denied by defendant. There is no evidence of subsequent serious difficulties between the husband and wife. The children all testified that the father and the mother seemed to care for each other.

According to the state's evidence, Smith, who admitted that he was married and was not certain whether his first wife had divorced him, a few weeks or less before the murder, made statements to the effect that he had a "hell of a time" when he was last out at the McKenzie place; that the "old s. o. b. of McKenzie didn't want me to go with his girl," but that he would go with her in spite of him; and that he had "slipped one over on the old man and married the girl." Smith denied making these statements. The defendant's evidence was to the effect that there was no objection by McKenzie to Ruby's engagement to Smith. This is substantially all of the evidence of the state, and that of the defendant.

In passing upon this assignment of error, defendant's evidence in conflict with that of the state must be disregarded. *State* v. *Dudley*, 96 W. Va. 481, 496. Bearing this well settled principle in mind, can it be said that the state's evidence and the other uncontroverted facts and circumstances in the case are such as to sustain the verdict? Unquestionably McKenzie was the victim of a very brutal murder, but does the evidence establish beyond a reasonable doubt the guilty agency of the defendant as a party to that crime? It is true that there are a number of circumstances which would seem to indicate that the defendant had knowledge of or was in some way connected with the crime. But strong suspicion in this regard is not enough. *State* v. *Dudley, supra.*

Realizing that where the evidence is entirely circumstantial, the establishment of a motive becomes highly important, the state included in its chain of evidence relied upon for conviction, facts and circumstances which, it is claimed, indicated that the defendant had a motive to kill her husband. In support of this theory the state introduced evidence of

previous quarrels between the defendant and her husband occurring more than six years before the murder. When objection was interposed, the state promised to show the continuation of this ill feeling down to within a few months of the crime. This the prosecution failed to do. Evidence of a material quarrel six years before, was, to say the least, very remote, and could have been of but little probative value in determining the guilty agency of the defendant, especially in view of the fact there was no evidence tending to show a continuation of the ill will engendered by the quarrel, and a possible causal connection between it and the commission of the crime charged. 30 C. J., sec. 408, p. 184. However, the state proceeded on the theory that by reason of the estranged relationship between the defendant and her husband, defendant had formed an attachment for Smith and had joined with him in the killing of her husband. The only evidence which could possibly be said to indicate that such relationship and plan existed between Smith and the defendant was the fact that the latter had evidenced concern upon Smith's arrest, and the statements allegedly overheard by Carpenter, a prisoner in jail, to the effect that the defendant, in talking to a fellow prisoner, had said that she and Smith were going away, and "to hell with the daughter". He said he heard this conversation by means of a steam pipe extending from the first floor of the jail where he was working up to the second floor where defendant and the fellow prisoner, Huff, were supposed to have been. It was introduced on rebuttal without any foundation having been laid, but went in without objection. It comes from a bad source, is highly improbable, was not corroborated by Huff, and is of little value in establishing motive. The other prisoner to whom she was supposed to have made this statement was not produced. Carpenter's evidence is of little value. The uncontroverted testimony establishes the fact that Smith, a young man 28 years of age, was engaged to Ruby, the sixteen-year-old daughter of the defendant, and this engagement had the approval of the defendant. Smith came to the home to see the sixteen-year-old daughter and not the 42-year-old mother

of nine children. The state apparently realized this fact when it later took the inconsistent position that the motive for the murder was the refusal of McKenzie to permit Smith, a married man, to call upon his daughter, Ruby.

Even though it should be determined that the evidence sufficiently points to Smith as a perpetrator of this heinous crime, yet, there is nothing to connect the defendant with its commission, except certain facts and circumstances which, as noted above, while casting a strong suspicion upon the defendant, do not, to a moral certainty, exclude every hypothesis consistent with her innocence. *State* v. *Gilfillen*, 96 W. Va. 660; *State* v. *Dudley*, 96 W. Va. 481. In order to sustain a conviction for the commission of a crime not only must the corpus delicti be established beyond any reasonable doubt by evidence, or by cogent and irresistible grounds of presumption, but the evidence of the defendant's agency in the commission of the crime must be so clear and convincing as to exclude every reasonable hypothesis of any and all other causes. *State* v. *Roush*, 95 W. Va. 132; *State* v. *Gilfillen, supra.*

We are not unmindful of the great weight to be given the verdict of a jury by the trial and appellate courts; and that such a verdict will only be set aside where the evidence is plainly insufficient to support it. But, ''on the other hand, the court should not hesitate to set aside a verdict where the evidence is of such character that it will not beyond all reasonable doubt prove the guilt of the accused. Especially is this so in cases where the evidence is wholly circumstantial. It is one of the fundamental rules that circumstantial evidence should always be scanned with great caution; and to convict on circumstantial evidence alone, it should, to a moral certainty, exclude every other hypothesis except that of guilt. Every single circumstance essential to the conclusions of guilt must be proved in the same manner and to the same extent as if the whole issue had rested upon the proof of each individual and particular circumstance.'' *State* v. *Dudley, supra.*

We conclude that an application of the well established rules above set out, to the evidence of the state and the other

uncontroverted facts and circumstances, does not warrant a finding that the defendant was a guilty agent in the commission of her husband's murder. The judgment will be reversed, the verdict set aside, and a new trial awarded.

*Reversed; verdict set aside; new trial awarded.*