# CHARLESTON.

## STATE *v.* WILLIAM DUDLEY

Submitted May 6, 1924.    Decided May 20, 1924.

1. CRIMINAL LAW—*Rule as to Conviction on Circumstantial Evi-
   dence, Stated.*

   To convict of murder upon circumstantial evidence in whole
   or in part, all the circumstances from which the conclusion
   of guilt is drawn, and without which it cannot be drawn, must
   be established by full proof; as well as every essential circum-
   stance necessary to the conclusion as if the whole issue of
   guilt rested upon the establishment of each essential circum-
   stance. (p. 496).

2. SAME—*Circumstances Must Exclude Every Reasonable Hy-
   pothesis of Innocence to Warrant Conviction.*

   Such circumstances when fully proven must be consistent
   with the hypothesis of the guilt of the prisoner, and exclude

every other reasonable hypothesis of innocence, in order that a verdict of guilty may be warranted. (p. 495).

3. SAME—*Circumstances Which Do Not Prove Defendant Guilty Beyond Reasonable Doubt Will Not Sustain Conviction.*

Proof of facts and circumstances which arouse strong suspicion of guilt or guilty knowledge of a crime on the part of the accused, but which do not prove beyond a reasonable doubt his criminal agency in its commission, will not sustain a verdict of guilty. (p. 496).

Error to Circuit Court, Pocahontas County.

William Dudley was convicted of murder in the first degree, and he brings error.

*Judgment reversed; verdict set aside; new trial awarded.*

*C. N. McNeil,* for plaintiff in error.

*E. T. England,* Attorney General, and *R. A. Blessing,* Assistant Attorney General, for the State.

LIVELY, JUDGE:

In March, 1923, William Dudley, Samuel Davis and Charles James were jointly indicted for the murder of Bascom Mc-Fall, the indictment alleging that the murder was committed on the 19th day of December, 1918. On the 6th of April following William Dudley was tried, convicted of first degree murder, and sentenced to confinement for life in the penitentiary. He obtained this writ of error.

The evidence is wholly circumstantial; the main assignment of error in the petition for the writ is that the evidence is not sufficient to sustain the verdict. Defendant's counsel has filed no brief, and relies upon the statements made in the petition for the writ, in which there are two points of error assigned: (1) that the motion to set aside the verdict as contrary to the law and evidence should have been sustained; (2) that the court erred in overruling defendant's objections to various questions propounded to the witnesses for the state, and in sustaining objections to the various and sundry questions asked of the witnesses by the defendant as shown by the record. No special bills of exceptions were taken to the introduction or refusal of evidence, and the motion to set aside the verdict did not point out any particular error

96 W. Va.

in that regard, and this assignment of error, too general in its nature, will not be considered. *State* v. *Joe Noble,* 96 W. Va. 432, decided this term; *Bartlett* v. *Bank,* 77 W. Va. 329. This leaves for consideration the ruling of the court upon the motion to set aside the verdict because contrary to the law and evidence, and necessitates a close examination and analysis of the evidence. Neither counsel for the accused nor the attorney general has made a condensed recital of the evidence in narrative form so as to present the substance clearly and concisely as required by Rule 5 of the rules of practice in this court. The petition relied upon by the accused, and the brief for the state, each contains a short general statement of the evidence without reference to the pages of the record, and hence, much labor has been placed upon this court. The brief of the attorney general relies upon the well known proposition that the jurors are the triers of fact and that the court will not disturb the finding of the jury if the evidence, together with the reasonable inferences and deductions which may be drawn therefrom, are sufficient to sustain the verdict; citing *State* v. *Cooper,* 26 W. Va. 338; *State* v. *Stowers,* 66 W. Va. 198; *State* v. *Henry,* 51 W. Va. 283, and several other West Virginia cases of like import.

The crime is supposed to have been committed in the town of Cass or in its near vicinity. Cass is on the Greenbrier river, and came into existence by reason of lumber operations in the vicinity owned by West Virginia Pulp and Paper Company. The main portion of the town, containing the offices, store and buildings of the Pulp company lies on the west side of the river, which is not very large at that point. On the east side of the river, opposite the main town, and said not to be within the control of the Pulp company, are several houses of a more or less disreputable character located up and down the river. Among these houses which are of special interest, is that of Sophronia Carter, a negro woman who appears to be the paramour of Charles James, alias "Jelly Roll," one of the defendants; down the river from her house is located the Riverview Hotel conducted by James Breakiron, in which, according to the theory of the state, the crime was committed; and still farther down the river is the dwelling of John Harris, alias "William" Harris, "Slim," or

"C. & O. Slim." The record indicates that there is a bridge across the Greenbrier river a short distance below Breakiron's hotel, which connects the portions of the town lying on each side of the river.

On Saturday, April 7, 1919, about 4 o'clock in the afternoon Frank Smith, who lived in the "mill pond" about one-half mile up the river from the location of the houses above described, saw some men near the road presumably engaged in playing poker, and he went in a roundabout way to observe what they were doing, accompanied by a small dog. A road ran along the river at this place extending down to east Cass and by the houses designated and for some distance, not disclosed, up the river above where Smith lived. In a laurel thicket about twenty-five feet from the road in a cluster of logs a body was found by Smith, lying upon its face behind the logs, without shoes, the feet being enclosed in white socks over which a rock was placed. Smith gave the alarm, various persons assembled, the body was left where found, and a guard being placed over it, until an inquest was held on the spot two days afterwards. Bascum McFall, an employee of the Pulp Company at Spruce, one of its lumber camps, had disappeared on December 19, 1918, and efforts to find him had been unavailing. His father C. H. McFall, resided in Greenbrier county, and attended the inquest and identified the body as that of his son Bascom, not from his features but from the clothes he wore, by his name in the coat pocket written with an indelible pencil, and by a little pocket comb. He identified the blue serge suit found on the body as having been purchased by his son from the Greenbrier Clothing House at Lewisburg. The body had on a blue serge suit, purple and black striped necktie, white shirt, white socks, a belt corresponding to one which Bascom McFall wore when he disappeared, no shoes, no hat, and a top shirt wrapped in paper was found in his side pocket. There was no money, watch or other valuables in the clothes. The windpipe and jugular vein were severed by a cut on the neck three inches long made by a sharp instrument. The body contained no blood except a very small quantity in the branches of the windpipe near the cut. Dr. Salter, who conducted the autopsy, was of the opinion that the body was emptied of blood

in two minutes after the wound was inflicted, and that the wound caused the death. One side of the face and both hands had been gnawed off presumably by some animal; the doctor examined the heart, lungs, the abdominal cavity and other vital parts of the body and found them in normal condition; there were no bruises on the body. The description of Bascom McFall when he disappeared, given by various other witnesses, including the color and kind of clothes which he wore, corresponded with the size of the body and with the clothes which were on it. At the time of Bascom McFall's disappearance on the 19th of December, he wore tan shoes and had purchased a mackinaw coat on that day; he also had a suit case. Neither of these articles was ever found. The body found is reasonably identified as the body of Bascom McFall. His death was caused by the severance of the windpipe and jugular vein. The hiding of the body behind the logs in the laurel thicket, the white socks on the feet covered by a flat stone, would indicate strongly that the death was caused by criminal agency. Of course, it is not absolutely clear that the wound was not self inflicted; but the secretion of the body at the place and in the manner set out would strongly indicate that a crime had been committed and that all evidence of it had been attempted to be destroyed or delayed. The *corpus delicti* has been reasonably well proven. The first and most indispensable fact has thus been established, namely, that a crime had been committed, for if there be no crime there can be no criminal. It is well established that no one can be required to answer for a crime without satisfactory proof of the *corpus delicti,* either by direct evidence or by irresistible and cogent grounds of presumption. *State* v. *Flanagan,* 26 W. Va. 116.

Does the evidence show beyond a reasonable doubt that defendant William Dudley committed the crime? This is the crucial question, and involves a close analysis of the evidence and the inferences which may be legitimately drawn therefrom.

Great caution should always be exercised by the trial and appellate courts in setting aside the verdict where a new trial is asked for solely upon the ground that the verdict is contrary to the evidence; or that the verdict is without sufficient

evidence to support it. Great weight is always given to the verdict of the jury and the judgment of the trial court in such cases by the appellate court; and the cases are rare where the appellate court has interfered. It is only where the evidence is plainly insufficient to warrant the finding of the jury that the appellate court will set it aside. On the other hand, the court should not hesitate to set aside a verdict where the evidence is of such character that it will not beyond all reasonable doubt prove the guilt of the accused. Especially is this so in cases where the evidence is wholly circumstantial. It is one of the fundamental rules that circumstantial evidence should always be scanned with great caution; and to convict on circumstantial evidence alone it should to a moral certainty exclude every other hypothesis except that of guilt. Every single circumstance essential to the conclusion of guilt must be proven in the same manner and to the same extent as if the whole issue had rested upon the proof of each individual and particular circumstance.

Bascom McFall, the deceased, arrived at Cass from the lumber camp about 10 o'clock December 19, 1918, accompanied by Ernest Chapman, both with the intention of going to their respective homes in Greenbrier county on the afternoon train going down the river. McFall had his pay check cashed which amounted to $91.60, out of which he purchased the mackinaw coal. He had a 21-jewel gold case watch. Chapman saw him about 2 o'clock that afternoon at the company store and again at 2:30 P. M. at the depot, with his suit case, which he left in the depot and went away. This was just before the train came, and Chapman never saw him afterwards. Cooper Erwin saw him about 10 o'clock that morning at the railroad crossing, where he was trying to trade watches with some young men, and was asked by McFall at that time if he knew where he, McFall, could get some whiskey. McFall was in Dan McGuire's boarding house, known as the ''White Elephant'' or ''Loggers' Home,'' about 10 or 11 o'clock that morning, and McGuire saw him afterwards about 1 o'clock at the depot. McFall went to Sophronia Carter's house about 2 o'clock in the afternoon for laundry, and got a blue top shirt which he put in his

pocket. This witness saw him again about 4 o'clock in the afternoon at "Slim'" Harris' shanty where there were several men playing poker, including McFall, Sam Spriggs, Sam Davis, William Dudley, a Mr. Spencer, Skeene Ratliff and others. At that time there were several colored men in "Slim's" place, and another negro woman brought some cider which the men drank at that time. This witness, who appears to have been the paramour of Charles James, alias "Jelly Roll," and who was then under conviction for killing another negro woman named Eliza Crawford on the morning of the 20th of December, 1918, said she staid at "Slim" Harris' shanty about an hour and left in company with the other negro woman who had brought the cider, leaving McFall sitting in the shanty with the other men. About 7 o'clock that evening she saw him going up the river above her house in company with Sam Spriggs and some other white men, four or five in all. About 8 o'clock he came back and stopped at her house in company with Sam Spriggs and three other men whom she did not name. At that time she did not see the accused or Sam Davis. McFall and his companions came to her house at that time to get something to mix some whisky in, and got a tin can and some sugar, and shortly afterwards left and went back up the river. After that time she did not see the deceased. The only time this witness saw McFall in the company of accused, William Dudley, was at "Slim" Harris' shanty in the afternoon about 4 o'clock, where the poker game was in progress. Witness T. L. Powers says he saw McFall come out of McGuire's place, the "Loggers' Home," about 3 or 4 o'clock in the afternoon, and go toward Breakiron's (Riverview) hotel, and McFall seemed to be "kind of off." Horton Johnson, (who appears to be one of the main witnesses for the prosecution and whose evidence on other matters and circumstances arising in the case will hereafter be given), said that about 2 or half past 2 o'clock that afternoon he saw a young man, whom he did not know, with Dudley, Sam Davis and Charles James ("Jelly Roll") together in the restaurant at Breakiron's hotel, and later the three went out together and up the river. He says this young man had previously asked him where he could obtain some whisky, and he, the witness, told him he

could probably get some at Breakiron's place. The witness started to go up the river with the party, when Davis told him to go back, and he then remarked to the young man that he was going up the road with three "pretty damned hard customers," to which the young man replied: "If I get anything I will give it to you." After that time the witness says he did not again see the persons named together. A motion was made to strike out the part of the evidence with reference to the "young man" being with Davis and Dudley, and the conversation that occurred, because the "young man" was not identified as Bascom McFall. The motion was refused, and the evidence went to the jury. These witnesses are the only ones who testified as to the movements and whereabouts of McFall on that day and night. It may be observed here that Dudley, the defendant, says he (Dudley) was at "Slim" Harris' house late in the afternoon where there were several other men whom he named, and some of whom he did not know, including several negroes, and that he played poker for a while until he drank some of the cider which made him sick and after lying down a short while he became better and left. He says he did not know McFall, and if he was there he did not play poker with him; that McFall may have been there, and may have played poker either before he went or after he left, but he knows that he played poker only with persons with whom he was acquainted.

The connection of the accused, William Dudley, with the events detailed, will now be stated. The only witness who saw Dudley in company with McFall on the 19th of December were T. L. Powers, whose evidence is above given, and Sophronia Carter, the negro woman who saw the company of men playing poker at the shanty of "Slim" Harris; and then the evidence of Horton Johnson as to the "young man" being in the company of Dudley and Davis, above detailed, which evidence is not very conclusive that the "young man" was in fact Bascom McFall. It appears that near where the body was found and close to the road there was a cluster of pine trees, in the seclusion of which the sporting element of the east side of the river were wont to play poker. Witnesses Frank Smith, Bill Smith and E. D. Burner, between

10 and 12 o'clock of the morning of the 20th, saw two men going up the road and disappear in the pines and stay there from five to fifteen minutes, and Frank Smith and Burner say they recognized the two men as William Dudley and Sam Davis. Skeene Ratliff, a witness for the state, says he went up to the cluster of pines after 9 o'clock on that morning for the purpose of engaging in a game of poker. It does not appear whether a game was going on there that morning or not. It appears that about 8 o'clock on the morning of December 20th a negro woman named Eliza Crawford was shot and killed at the house occupied by Sophronia Carter and Charles James, alias "Jelly Roll," a crime for which Sophronia Carter was later tried and convicted. Quite an excitement was aroused over this killing, and several witnesses testified that they observed patches of blood in the road beginning about three hundred feet above the Riverview Hotel and leading up the river in the direction of where the body was later found in the month of April. Just how far these blood patches extended up the river does not clearly appear. Many of the witnesses fix their recollection concerning the circumstances of this case by the fact of the killing of the negro woman which they remembered was on the 20th of the month. The two Smiths and E. D. Burner observed these splotches of blood in the road. On the day of the inquest it appears that the accused, Dudley, and Sam Davis were in the concourse of people who assembled there for that purpose, and Frank Smith testified that he heard a remark made by Davis to Dudley on that occasion to the effect that: "We didn't put that rock there when we put him there." Burner also heard the remark, but flatly contradicts Smith in that regard, and says Davis was making an observation of a fact which was apparent to all the observers, namely, that whoever placed the body there had afterwards put the rock over the feet to hide the white socks. The evidence of Frank Smith as to this remark is not very convincing, and is entitled to very little weight. It would be most remarkable that any one, whether suspected of the crime or not, would make a public declaration of the kind as stated by Smith, in the presence of those conducting the inquest. It must be remembered that four years and more had passed

since the time the inquest was held. It is in evidence that efforts had been made both by the county and municipal authorities to ascertain the perpetrator of the crime, and more than one person had been apprehended and given a preliminary hearing. The memory of this damaging remark made by Davis to Dudley seems to have rested rather lightly for a long length of time on the memory of witness Smith.

From the foregoing it will be noted that McFall and Dudley were both in the town of Cass on the 19th of December, and were seen together leaving the "Loggers' Home" in company with Davis about 3 or 4 o'clock P. M. and that they were in the crowd of men congregated at the house of "Slim" Harris about the same time or a little later, and that McFall was not again seen except by Sophronia Carter when he came to her house once or twice that night, and left with a party of men going up the river. No one says Dudley was in the party which was at her house, or in the party which went up the river. McFall's body was found in April following, secreted in the logs and laurel near the place under the pines resorted to by men for the purpose of gaming. When and where he met his death, or when his body was removed and secreted in the laurel is left to conjecture. There is nothing in the incidents so far stated which would connect Dudley with the murder, any more than would implicate eight or ten men, both white and colored, who were at large that night and who would have had equal opportunity and motive for the commission of the crime. Where and under what circumstances was the crime committed? When was the body secreted in the laurel? These are questions which are shrouded in doubt and mystery. Who committed the crime? Was it deliberate and premeditated, with a motive for robbery? Was it a sudden brawl among drunken men over the card game resulting in the homicide? Was robbery the motive, or was robbery conceived after the slaying? Did Dudley commit the deed or was it committed by others in his presence? Was he a participant in the killing or a spectator with knowledge of the guilt? These are questions which cannot be correctly answered beyond a reasonable doubt from the facts and circumstances proven. Sophronia Carter says that neither Dudley nor Davis was in the party which came

to her house about 8 o'clock that night. Sam Spriggs and three others were in the crowd; and Charles James ("Jelly Roll") was at her house then, and left with the party, returning about midnight to get a flash light. She saw Sam Davis and "Jelly Roll" with two or three others coming toward her house a little after midnight, and Davis was carrying something "pretty large" and the men were quarreling—she recognized the voices of Davis and "Jelly Roll," as they passed her house and went on up the road. Before this incident she says "Jelly Roll" had sent Davis to her house to get an axe with which to cut some poles, which axe was never returned. It will be observed that Dudley was not seen in the night doings, and is only connected therewith by inference. She says, however, that "Jelly Roll" and William Dudley came to her house a little before daylight and appeared to be quarreling over money matters, Dudley leaving very soon. At that time "Jelly Roll" had a flash light and had blood on the flashlight and his fingers, saying he had hurt his hands. On cross examination she says she was tried, convicted and sentenced for killing the Crawford woman, saying that she swore she killed her because she was afraid of "Jelly Roll," but that it was the latter who shot and killed the Crawford woman. She says she went to bed about 10 o'clock and slept well except when she was "awakened by the row." George Holliday, who worked at night for the Pulp company, saw three flash lights about 12 or 1:30 o'clock that night, a distance of thirty or forty yards apart in the road near where the body was found; and observed lights about the house of John Rose who lived four or five houses up the river from the Riverview Hotel; and Skeene Ratliff, who also worked that night, observed one flash light near where the body was found, about 1 or 1:30 o'clock. The inference to be drawn from this evidence is that the perpetrators of the crime were secreting the body by the use of flash lights. A different inference could be reasonably drawn. Those who conceal crime love darkness rather than light. The remaining evidence which tends to connect Dudley with the crime is contained in the testimony of Horton Johnson, a lumber jack and man about town, and James Milligan, both of whom staid at Breakiron's hotel that night.

Where and how Johnson spent the forepart of the night does
not appear, but he says he went to Breakiron's hotel that
night about 12 o'clock, entered the lobby where he took off
his shoes, (the only time he ever took his shoes off in the lobby
before or after), and went up stairs at the upper end of the
building and then down to his room through the hall which
ran parallel with the river. He says he stopped at the first
room which is on the right at the head of the stairs and
heard a racket therein and a man hiccough and say "Oh
dear," and also heard some one say "Watch out for old
Johnson, he is in town, and he travels all times in the night,"
and another voice say "I like him well enough to mix him up
in it." He says he thinks the voice making the latter remark
was that of William Dudley, but could not say for sure and
didn't know of any reason why he thought it was Dudley's
voice. After he got in bed and locked the door he heard a
man coming through the hall down the river and say: "This
is nice, still quiet night;" that the man went back and the
witness then opened his door and heard some one say in the
room at the head of the stairs: "We done it, let's get him
to hell out of here." Although there was no light in the
hall, he says he then saw three men carrying something out
of the room on something that looked like a stretcher with
a white sheet over it, and take it on down stairs the way he
had come up. He then went to the window but saw nothing
further at that time but heard the pump rattling and some
one say something about "Nice night," or a similar remark.
This was about 12 or 1 o'clock. A little later he saw three
men carry the white sheet to the coal house across the road.
He then went to bed and slept until morning, when he got up
and entered the room at the head of the stairs, room No. 2,
the door of which was slightly open, went in, saw blood in a
bed and bloody sheets on the floor; then went out and observed
the chambermaid, Hattie Perry, standing near the head of
the stairs. He did not remember seeing Dudley, the accused,
that morning about the hotel. Later he went to Dan Mc-
Guire's boarding house and told McGuire what he had seen
that night. It appears that he said nothing to the officers
of the town about the incident related, but avers that he told
it to various other persons all over the state of West Vir-

ginia. Why he had not detailed these circumstances in connection with the many arrests and preliminary hearings concerning the murder of Bascom McFall is not explained. In this connection it may be observed that Breakiron, the proprietor of the hotel, who occupied with his wife Room No. 12 on the second floor, says nothing unusual occurred that night; that he was up until about 3 o'clock that morning and knew that Dudley and Davis at that time slept in Room No. 11, across the hall from his room; that Davis stayed in the room with him and his wife until about 3 o'clock in the morning, during which time they consumed nearly a quart of liquor; that he did not hear Dudley come to his room that night. Other witnesses who slept on that floor heard nothing unusual and saw nothing unusual the next morning. Two witnesses, Nick Connolly and Joe Koontz, (the former worked on Cheat Mountain at the Deer Lick mines, and the latter lived in Maryland but was in Cass that night), both say they slept in Room No. 2 that night, and nothing of the kind detailed by Johnson occurred therein. They saw nothing unusual about the hotel either that night or in the morning. Breakiron says he always went through the rooms to observe their condition and if any damage had been done by his roomers, and that there was no blood or anything unusual observed by him in Room No. 2 or in any other room in the hotel; the chambermaid, Hattie Perry, testified that she made up all the beds in the rooms on the second floor, including Room No. 2, and excepting No. 12, and there was no blood in Room No. 2 or anywhere else about the hotel and nothing unusual had occurred there that night. Breakiron says the lobby door was locked after 10 o'clock and those sleeping on the second floor had to enter the back way by a stairway on the outside of the lower end of the house. Whatever weight may have been given by the jury to the evidence of the defense as to this rather startling occurrence to which Johnson testified, is not very material. From Johnson's own testimony the connection of Dudley with the incident, if it ever occurred, is all together weak. Johnson says he was not sure, but thought the voice in Room No. 2 was that of William Dudley. He was not positive. There were no stretchers about the hotel. No one saw blood about the hotel except this witness.

All of the state's witnesses agree that splotches of blood were found in the road above the hotel about three hundred feet, and nearer to the negro shanty. Breakiron and another witness say Johnson did not stay in the hotel that night and was not in Cass that day. Johnson further states that some time after this occurrence he had a conversation with Dudley and Davis near Cross's place, and Dudley said to him: "Damn fool, you smart enough, you know enough to send you to hell," or something like that. This remark was made in a conversation between them concerning Breakiron and his desire to have them board at his hotel.

James Milligan said he spent part of the night at Warwick Simmons' and the latter part at Breakiron's hotel, where he slept; that he came from Simmons' place to the hotel between 12 and 1 o'clock, and while at the pump near the lower end of the house William Dudley approached him from the direction of the road, to which his back was turned, and said to him: "Skip, if you seen anything if you tell it you will get the same as he did, and you will go up the back way." He had no conversation with Dudley on that occasion, didn't know what he meant, didn't ask him what was the cause of the remark, was not surprised at it, was not scared or perturbed by the remark, and went up the back way which was a stairway leading up from the outside at the end of the house to the end of the hall, and went to bed and slept until morning when he observed Davis and Dudley in front of the hotel engaged in conversation. Later, in May, 1919, at the foot of the bridge, being accompanied by Jim Baker, he met Dudley who suddenly said to him: "Skip, if you seen anything if you tell it I will kill you," and also, "I have a notion to do it now." Jim Baker was not a witness. Milligan says he does not know why Dudley made this remark to him or what it was about, that he didn't engage in any further conversation and that it made no impression upon his mind. Another witness testified that in conversation with Dudley prior to the finding of the body he observed him look in the direction where the body was found, in a manner which attracted his attention.

This completes the evidence of the state. While it would serve no useful purpose, it may be observed that Dudley testi-

fied, giving a full account of his movements and doings on the 19th of December and subsequently, in which he stated that he did not know McFall and had never seen him to know him; that he may have been in the gathering of men at "Slim" Harris' place about 4 o'clock or later on that afternoon, but that if he was there he did not know it; that after he drank the cider and recovered from his slight illness therefrom he left and was met by "Jelly Roll" near Break-iron's building, who told him that a woman wanted to see him; that he went up to "Jelly Roll's" house with him; saw the Carter woman lying on the bed, and she told him she didn't want to see him; that he immediately left and went from there to the house of Hattie Perry and stayed until about 9 o'clock in company with John Rose, for whom he had issued process as a witness and who was not found; that he went from there to Breakiron's hotel and retired about 10 o'clock in the room opposite the one occupied by Breakiron and his wife; that Sam Davis was lying on the bed when he went to sleep, that he slept until morning when he woke up and while lying in bed Mrs. Breakiron informed him that the Crawford woman had been killed; that he then got up and went to the scene where the Crawford woman was supposed to have been killed. He denies that he was in Room No. 2 that night, that he saw or spoke to Milligan at the pump or that he ever made any threats to him at that time or afterwards; that he was not with "Jelly Roll" at Sophronia Carter's house about daylight and that he knows nothing of the cause of the death of deceased. He had ceased work for the lumber company about that time and did not return to work until about the first of January following after the Christmas holidays; he had little money on the 19th and had borrowed $2 from Breakiron for the purpose of purchasing some liquor, which loan he had never repaid. There is no evidence to show that he had any of the money, property or effects of deceased. He worked in the neighborhood of Cass, making that town his headquarters, until about a year after the disappearance of McFall; from there he went to Virginia, later returning to work in West Virginia, on Coal River, and then back to Virginia, where his family resides. There is other evidence, unnecessary to detail, corroborating the statements

of Dudley. But as the jury passes upon the weight and conflict of evidence we must discard all the testimony of the defense which is in conflict with that of the state, and determine from the state's evidence alone and the facts and circumstances, whether the state's evidence is sufficient to support the verdict.

The rules of law governing the ascertainment and determination of the guilt of an accused person where the evidence is circumstantial is well stated by Judge LITZ in the case of *State* v. *Bennett*, 93 W. Va. 548, 117 S. E. 371, and which amplifies somewhat the rules and principles stated by Judge WOODS in the case of *State* v. *Flanagan*, 26 W. Va. 116, as follows:

"First, It is essential that all the circumstances from which the conclusion is to be drawn shall be established by full proof, and the party upon whom the burden of proof rests is bound to prove every single circumstance which is essential to the conclusion, in the same manner and to the same extent as if the whole issue had rested upon the proof of each individual and essential circumstance

"Second. All the facts and circumstances, when established by full proof, must be consistent with the hypothesis of the guilt of the accused.

"Third. It is essential that the circumstances should be of a conclusive nature and tendency. Evidence is always indefinite and inconclusive, when it raises no more than a limited probability in favor of the fact, as compared with some definite probability against it, whether the precise proposition can or cannot be ascertained. It is, on the other hand, of a conclusive nature and tendency, when the probability in favor of the hypothesis exceeds all limits of an arithmetical or moral nature. Such evidence is always insufficient where, assuming all to be proved which the evidence tends to prove, some other hypothesis may still be true; for it is the actual exclusion of every other hypothesis which invests mere circumstances with the force of proof. Whenever, therefore, the evidence leaves it indifferent which of several hypotheses is true, or merely establishes some finite probability in favor of one hypothesis rather than another, such evidence cannot amount to proof, however great the probability may be.

"Fourth. It is essential that the circumstances should

> to a moral certainty actually exclude every hypothesis
> but the one proposed to be proved.  *State* v. *Flanagan,*
> 26 W. Va. 122.''

When we weigh, analyze and consider the state's evidence
we cannot say that it excludes to a moral certainty every
hypothesis inconsistent with the innocence of the accused.
It creates an inference or conclusion of strong suspicion that
he was in some way connected with the crime; but suspicion
however strong is not sufficient to convict.  *State* v. *Chafin,*
78 W. Va. 140, 88 S. E. 305.  In *Johnson* v. *Commonwealth,*
29 Grat. 796, it was said: ''That it is always insufficient,
where, assuming all to be proved which the evidence tends
to prove, some other hypothesis may still be true; for it is
the actual exclusion of every other hypothesis which invests
mere circumstances with the force of truth;'' and ''That
where the evidence leaves it indifferent which of several
hypotheses is true, or establishes only some finite probability
in favor of one hypothesis, such evidence cannot amount to
proof, however great the probability may be,'' citing Stark.
on Evidence, 572.  The accused is entitled to an acquittal
unless the fact of guilt is proven to the actual exclusion
of every reasonable hypothesis of innocence.  *Bundick's Case,*
97 Va. 783;  *Prather's Case,* 85 Va. 125;  *Pryor's Case,* 27
Grat. 1009;  *Grayson's Case,* 6 Grat. 713;  *State* v. *Flanagan,*
26 W. Va. 117.  The evidence of Sophronia Carter that ac-
cused, in company with ''Jelly Roll,'' came to her house about
daylight, when ''Jelly Roll'' had blood on his hands, saying
that he had hurt them, is not at all conclusive of defendant's
guilt.  There appears to have been nothing about his person
which would indicate participation in the crime.  He was
with a bad character, if her evidence be true.  This evidence
does not come from a very reliable source.  The only other
evidence which would tend to connect defendant with the
crime, except the fact that he like many others was in Cass
that day in questionable company and had the opportunity,
is the evidence of Johnson and Milligan as to the alleged
conversations with defendant at that time and subsequently.
Taking these conversations alone they could only create strong
suspicion of defendant's participation in or knowledge of a·

crime. It appears that Johnson and the accused were not on the best of terms, having had some personal difficulty. The motive for the commission of the crime is not clearly shown and can only be determined by inference. Whether robbery was the motive, or whether robbery occurred as an afterthought by some of the perpetrators is in doubt. The actions of the accused in remaining in the neighborhood for over a year and at work, a fact which is not disputed, is somewhat in his favor.

Considering the evidence of the state and the facts and circumstances and applying to them the well established rules above set out for the consideration of circumstantial evidence, we have come to the conclusion that the case presents one of very strong suspicion of guilt against the accused, but not sufficient to warrant the finding of guilty and the consequent imposition of a life sentence. The judgment will be reversed, the verdict set aside and a new trial awarded.

*Judgment reversed; verdict set aside; new trial awarded.*