STATE OF WEST VIRGINIA

*v.*

FARRIS TABET

(No. 10392)

Submitted October 3, 1951.　　Decided October 30, 1951.

Fox and HAYMOND, dissenting.

*Samuel D. Lopinsky, Jackson D. Altizer,* and *M. E. Boiarsky,* for plaintiff in error.

*William C. Marland,* Attorney General, *Thaddeus D. Kauffelt,* Assistant Attorney General, for defendant in error.

RILEY, JUDGE:

Farris Tabet was indicted, tried and found guilty in the Intermediate Court of Kanawha County of the violation of Chapter 25, Article 10, Acts of the Legislature, 1939, Section 11-a, commonly known as the "numbers" statute, and sentenced to the State penitentiary for an indeterminate term of one to five years. This writ of error is prosecuted to the order of the Circuit Court of Kanawha County, refusing a writ of error to the judgment of conviction.

The indictment, consisting of six counts, charges, in effect, that, on the _____ day of July, 1950, the defendant did unlawfully, feloniously and knowingly (1) keep, occupy and use and permit a place, building room, table, establishment and apparatus for "policy" and "numbers" playing, and for what are commonly called "lottery policies"; (2) deliver and receive money and other valuable consideration in playing "policy" and "numbers", and in aiding the playing thereof; (3) have in his possession certain writings, papers, and documents, representing and being records of chances, shares and interests in numbers drawn and selected to be drawn in what is commonly called "policy" and "numbers", and in the nature of a bet, wager or insurance upon the drawing and selecting of numbers of a "policy" and "numbers" lottery; (4) have in his possession certain papers, prints, writings, numbers, devices, policy slips and other articles commonly used in carrying on, promoting, and playing the games called "policy" and "numbers"; (5) was "the owners, agents, superintendents, janitors and caretakers of certain places, buildings and rooms where 'policy' and 'numbers' playing and the sale of what is commonly called 'lottery policies' was carried on with" defendant's knowledge, and after he had been notified that said premises were so used, "did unlawfully, feloniously and knowingly permit such use to

be continued"; and (6) did "aid, assist and abet other persons to the Grand Jurors unknown", in doing and performing the acts alleged in the indictment.

On December 8, 1950, prior to the selection, empanelling and administration of the oaths to the jurors, the defendant, having been sent to the bar of the Intermediate Court in the custody of the sheriff (1) moved the court to quash the indictment therein, and (2) moved the court to require the State to elect upon which of the counts of the indictment he was to be tried, which motions the court overruled and thereupon the defendant pleaded not guilty. Thereupon the jury having been selected, empanelled and sworn, the case was set for trial at nine-thirty o'clock in the forenoon of December 9, 1950.

Tabet rented from State's witness, Ed L. Boggs, the buildings at Nos. 155 and 159 Summers Street, a part of which he subleased to one Lonzo Peace at a rental of fifty dollars a week for a shoe shine shop, and the rest of said building, consisting of approximately one-half thereof, he subleased to one Gregory for a restaurant at a rental of two hundred fifty dollars a month. In 1948, defendant rented the entire premises at No. 155 Summers Street to Joe Levinson, and removed therefrom to operate a place on Summers Street known as Monarch Pool Room. A restaurant and pool room were operated by the defendant at said No. 159 Summers Street, when Diamond Billiards was incorporated with Tabet as a majority stockholder thereof. This record does not disclose that Tabet was an officer or member of the board of directors of Diamond Billiards. From the time of its incorporation until the happening of the events involved in this suit, Diamond Billiards has continued to operate the restaurant and pool room at No. 159 Summers Street, with Nathan Comer, as its manager.

State's witness, Sabe G. Corey, had indorsed Tabet's note in the amount of fifteen thousand dollars for negotiation at Kanawha Banking & Trust Company, which note was paid at the rate of one thousand dollars a month;

and later, on May 4, 1950, Corey indorsed another note for said defendant at said bank, in the amount of twenty-eight thousand five hundred dollars, from the proceeds of which the balance of the fifteen thousand dollar note was paid, and a deed of trust was given by "Diamond Billiards" to secure the second loan, which deed of trust was executed by the defendant.

On the complaint of State's witness, Eloise Jackson, made to the Police Department of the City of Charleston, that she had purchased, at the Idle Hour Pool Room, where she was then employed, from State's witness, Thomas Harvey Richardson, designated in her testimony as "Ross Richards" a winning number, as shown by a numbers slip held by her and introduced in the record as one of the State's exhibits, which had not been paid, two search warrants were obtained before H. G. Thayer, a Justice of the Peace of Kanawha County, on July 3, 1950, the search warrant complaints being executed on the same day. A raid was made on July 7, 1950, at the shoe shine shop at No. 155 Summers Street, and the premises at No. 159, which was then being operated by Diamond Billiards.

The raid on the shoe shine shop at No. 155 Summers Street produced an expired life insurance policy on the life of Farris Tabet for the term of one year, which had expired September 17, 1945; membership cards in the Southern West Virginia Automobile Club for the year 1945 in the names of Farris Tabet and his wife; and a battery warranty and adjustment agreement, issued by Standard Oil Company of New Jersey, dated July 13, 1947.

The raid at Diamond Billiards at No. 159 Summers Street produced: A topcoat hanging in a semi-public closet back of the counter, evidently not belonging to defendant, in the pocket of which was a paper bag containing an envelope, bearing the name "Kanawha Banking & Trust Company" with five yellow numbers slips with certain writing thereon, including figures; unidentified cash found in three envelopes in the pocket of said coat,

in the respective amounts of $9.85, $7.75 and $2.80, in the latter of which were some slips of paper; several yellow numbers sheets found in the wastebasket, and a steel box, which contained memoranda on adding machine tape, some of which bore the legend, "Cash to Mr. Tabet", followed by various figures and the date "10/17"; a diary for the year 1948 found in the safe, which contained a list of cash turned over to defendant in part and to one F. E. Davis, bearing date September 17, 1948; a cigar box found in the safe, which contained memoranda on which appeared figures, notes and initials; a number of slips showing withdrawals of cash by defendant, such as "4-12-49, Farris $25.00"; and certain cards filed as "State's Exhibit No. 17", purporting to be a notification to "all houses" of a change in the rules of payoff on a gambling game, the nature of which is not disclosed by this record. None of these initials, figures or notations was in defendant's handwriting.

The purported winning number which Eloise Jackson, the prosecuting witness, testified she had purchased from State's witness, Thomas Harvey Richardson, should have, according to her testimony, paid her fifty dollars. She testified that when she asked Richardson for payment it was refused; whereupon she went, at Richardson's direction, to see the defendant.

On her first visit to Monarch Pool Room, made at the instance of Richardson, who had refused payment, she was told to see the man who wrote it. Upon advising Tabet that such person had directed her to him, he stated that he could not be responsible for somebody else's mistakes. After meeting a man named Hawkins at the shoe shine shop, she returned to the Monarch, on which occasion she testified that Tabet gave her a package of matches bearing the name "Monarch Pool Room", with its address and certain descriptive matter. She testified further that Tabet showed her a "yellow slip or slip of paper." And, when interrogated as to whether she had at that time shown Tabet her slip of paper, she said, "I had

it in my pocket and I opened it up and let him see I had it."

"Q. What did that have?

"A. It had a list of numbers and it was all totalled up at the bottom.

"Q. What did he say to you about that slip?

"A. He said that was the original slip that was turned in, and he showed me where they had made a mistake in the amount of money. That is why he said he couldn't pay off because it was not his mistake.

"Q. Whose mistake did he say it was, if he said?

"Objection; overruled; exception.

"Q. Did he say anything about whose mistake it was?

"A. He said it was * * * [Richardson's]."

Mrs. Jackson testified further that defendant had twenty-five dollars for her, which he refused to pay, because she had complained to the Police Department of the City of Charleston.

Richardson testified that he sold the purported winning number to Mrs. Jackson at the "Idle Hour" on Summers Street where she was then employed; that he turned his numbers in at No. 155 Summers Street; and that when he spoke to Tabet about the number he had written for Mrs. Jackson, defendant told him: "If you wrote that number and the slip, you will have to be responsible for it. You know the rules of the house." There is nothing in Richardson's testimony to indicate that he was employed by the defendant, but he did testify that the winning number was posted on the scoreboard at Diamond Billiards, though the record does not disclose by whom it was posted, or that Tabet knew of the posting.

Frank H. Marple, manager of Monarch Pool Room, testified that he heard the conversation between Mrs. Jackson and the defendant; and that the defendant told the

prosecuting witness, "I am sorry, Lady, but I have no connection with numbers. I don't know anything about that. My advice to you is to see the man who wrote the number." This witness further testified that defendant told Mrs. Jackson that if there was any way in which he could help her, he would be glad to do so; that the match books with the name of the pool room on them were placed around the counter there, so that they would be available for anyone who wanted them; and that though he had been employed by Monarch Pool Room for approximately five years, he had never seen Richardson in the place.

The numbers slips, introduced into evidence and obtained as a result of the raids, were connected with no particular person. The record is devoid of any evidence that numbers ever were turned over to defendant at Nos. 155 or 159 Summers Street or at Monarch Pool Room. The only evidence bearing on this issue is the testimony of State's witness Richardson, who was asked, "To who did you turn your numbers in at the time you were in the numbers business?", to which he replied, "To No. 155 Summers Street.", in which was located "a shoe shine parlor."

With the exception of Richardson's testimony, the only evidence purporting to connect the defendant with the numbers business is the testimony of Eloise Jackson, which, in all essential particulars, the defendant denies. She testified that when she went to see defendant about Richardson's failure to pay the purported winning number, which she held, he showed her a yellow slip, while witness exhibited to Tabet a white slip, which she said had been given to her by Richardson, and that "He [Tabet] said that was the original slip that was turned in, and he showed me where they made a mistake in the amount of money. That is why he said he couldn't pay off because it was not his mistake"; and later in answer to the inquiry, "Did he [Tabet] say why he had the yellow slip rather than the slip you showed him," the witness

answered, "That is the one they turned in. He said they was not allowed to carry the yellow ones around."

The defendant testified that he did not know Richardson, and had nothing to do with the numbers business; and that when Mrs. Jackson came to his place of business, he advised her to see the man who had written the number; that he had nothing to do with any particular number; that he did not offer to pay Mrs. Jackson twenty-five dollars or any amount; that Mrs. Jackson was very angry, and said that somebody was going to pay her for the claimed winning number. Tabet testified that when he moved from No. 155 Summers Street to Monarch Pool Room, he left the old papers which were found during the raid at that address. Tabet categorically denied that he had anything to do with the numbers at No. 155 Summers Street and Diamond Billiards, and if any were sold at either place he testified he had no knowledge of it.

Defendant further testified that after he had subleased No. 155 Summers Street, and removed his activities to Monarch Pool Room, he went to the first-named address only occasionally to get a shoe shine; that at the time of the raids all his activities were confined to Monarch Pool Room; and that he went to Diamond Billiards not more than once a month. He explained the slips, indicating cash paid by him and to him, which were found at Diamond Billiards, by saying that he was frequently advanced cash by the manager of Diamond Billiards, and that sometimes he paid cash into the business.

During the course of the trial Captain Dewey Williams of the Charleston Police Department, who was in charge of the raids at both places, testified that in the bottom of a showcase at No. 155 Summers Street he found some papers, which were not identified in the record at that time; and he was then asked to examine an envelope presented to him, "And see if those are the papers you took from the showcase at No. 155 Summers Street"; whereupon defendant's counsel asked the court that they be permitted to examine the contents of the envelope, which

permission was refused on the ground that State's counsel had informed the court that the envelope had not been, and would not be, tendered in evidence.

Defendant assigns in his brief four grounds of error: (1) The trial court erred in overruling defendant's motion to quash the indictment on the ground that there was a misjoinder of offenses therein; (2) the court erred in overruling defendant's motion made before the introduction of evidence that the State be required to elect upon which count of the indictment it would rely at the trial; (3) the State failed to prove that a crime had been committed at No. 155 or No. 159 Summers Street, and particularly failed to prove that a crime had been committed by defendant; and (4) the trial court erred in refusing to permit defendant's counsel to examine the contents of the envelope, concerning which Captain Williams testified, and which were not offered in evidence.

For convenience the grounds of error will be discussed *seriatim.*

The six disjunctive provisions of Section 11-a, Chapter 25, Article 10, Acts of the Legislature, 1939, are alleged fully in the six counts of the indictment, and are the allegations necessary to be proved. 1 Lee, The Criminal Trial in the Virginias, 2d ed., Section 9. Each count is complete and perfect in itself, and sets forth a separate offense, though all the offenses charged in the several counts represent a single continuous transaction and there is a common penalty of confinement of one to five years in the penitentiary. We therefore are of the opinion that the trial court properly overruled the defendant's motion to quash the indictment on the ground that there is a misjoinder of offenses therein. *State* v. *Larue,* 98 W. Va. 677, pt. 3 syl., 128 S. E. 116: "If all of the offenses charged in one or more counts of an indictment represent but one continuous transaction, it is well settled in this State that they may be so joined as distinct offenses in different counts, and that where properly joined as distinct offenses, unless they appear on the face of the indictment to in-

volve a different transaction, a motion to quash for misjoinder should be overruled." See generally 9 M. J., Indictments, Informations and Presentments, Section 42.

Likewise we perceive no error in the court's ruling in refusing the defendant's motion that the State be required to elect upon which one or more of the several counts it would rely in its effort to convict the defendant. This Court held in *State* v. *Larue, supra*, pt. 4 syl: "A joinder as separate counts in one indictment of several offenses, which though distinct in point of law, yet spring out of substantially the same transaction, cannot operate to the legal prejudice of the accused; and he is not entitled as a matter of right in such case to compel an election." See *State* v. *Cutlip*, 131 W. Va. 141, pt. 1 syl., 46 S. E. 2d 454, and 1 Lee, The Criminal Trial in the Virginias, 2d ed., Sections 31 and 32.

Because of the somewhat detailed character of the evidence, our discussion of defendant's third assignment of error that: "the State failed to prove that a crime had been committed at No. 155 or No. 159 Summers Street, and particularly failed to prove that a crime had been committed by the defendant" will necessarily entail a repetition of the matters contained in the foregoing statement of facts.

This record discloses that a major part, if not all, of defendant's activities were conducted at the Monarch Pool Room, which was physically separate and distinct from the premises known as No. 155 and No. 159 Summers Street, which the defendant had leased from State's witness Ed L. Boggs. In 1948 defendant had removed from No. 155 Summers Street, having then rented the entire building to Joe Levinson. Prior to that time he had leased said premises at No. 155 for a shoe shine shop to Alonzo Peace, who was the occupant thereof at the time of the raid, at a monthly rental of fifty dollars.

Except for Tabet's stockholdership in Diamond Billiards and his position as original lessee of No. 155 Summers Street; and the slips bearing the legend "Cash to Tabet",

and the diary found in the safe, which contained a list of cash turned over to defendant and to F. E. Davis, there is nothing in this record to indicate that defendant had any connection with No. 155 or No. 159 Summers Street, after his removal to the Monarch Pool Room.

The one-year insurance policy on the life of Tabet, expiring September 17, 1945; the membership cards in the names of Mr. and Mrs. Tabet in the Southern West Virginia Automobile Club, expiring September 17, 1945; and the battery warranty and adjustment agreement issued by Standard Oil Company of New Jersey, dated July 13, 1947, found at No. 155 Summers Street on the occasion of the raid, did not establish that defendant had any connection with said premises at the time of the raids, as the dates of those papers antedated defendant's removal from No. 155 Summers Street. Their presence on the premises is fully and completely explained by Tabet, when he testified that he left some old papers there, evidently meaning to discard them.

But there is no evidence obtained from the raids and offered by the State which connects Tabet with the operation of a numbers business at either No. 155 or No. 159 Summers Street.

There is, of course, strong evidence in this case, derived solely from the raids, tending to show that the numbers business was being conducted at No. 159 Summers Street. Though presenting suspicious circumstances, strongly tending to show that such business was, or had been, conducted in the premises, such evidence of itself does not connect the defendant Tabet with such business.

Let us at this point assume that a numbers business was being carried on either at No. 155 or No. 159 Summers Street, or at both places. It is the defendant, not the places, who is charged in this indictment with the operation of a numbers business, and unless the State has produced such evidence that the jury could have found, beyond a reasonable doubt, that defendant was connected with that business, the instant verdict cannot stand.

The State's main reliance in order to support this conviction is the testimony of the prosecuting witness, Eloise Jackson, and that of the drifter, Richardson, who came to Charleston only recently, and at the time of the raids, as well as at the time of his own arrest, was, according to his own testimony, making two or three dollars a day writing numbers. Mrs. Jackson, according to this record, was an angered, vengeful woman, mainly because of the treatment she had received with reference to the purported winning numbers slip which she held. She may have been justified in her wrath. This is not for us to say, but we do say that her attitude toward this whole matter, as disclosed by this record, should prompt us to review her testimony carefully in the light of the other evidence in the case. She on examination admitted that when she approached Tabet about the failure to pay her for the purported winning number which she held, he told her he had nothing to do with it, and told her to go to see the man (Richardson) to whom she paid her money for the ticket and who made the alleged mistake in calculation. She did not go to Tabet because she knew he was in the numbers business, which had the outstanding slip which she held: she went to him because Richardson told her to go to him. She testified that Tabet told her to go to see the person who wrote the ticket; and that defendant said he had twenty-five dollars for her, but would not give it to her because she had complained to the Police Department of the City of Charleston. But whether Tabet made an offer of twenty-five dollars in payment of the prosecuting witness' winning number does not necessarily indicate that he regarded himself as responsible for the reimbursement of Mrs. Jackson. He may have made the offer because he felt that he was morally bound to do so; but, on the other hand, he may have made such offer in order to relieve himself of the harassment of Mrs. Jackson's visits to him. Mrs. Jackson, however, did purchase a numbers slip from someone, evidently Richardson, which was introduced into evidence, but this record does not disclose that she purchased

it from Richardson as Tabet's agent. Richardson did not testify, and at no place in this record is it shown, that he was working for Tabet.

But the State contends that this record shows that Mrs. Jackson on the occasion of one of her visits to Tabet was shown by him a yellow numbers slip, which is the operator's copy of the numbers sold. The testimony in this regard is indefinite indeed. She was asked: "You stated that on one occasion Mr. Tabet showed you a yellow slip or a slip of paper", but whether the propounding of that question was referring to the yellow numbers slip, the question does not show. To this question Mrs. Jackson answered: "That is right". Then the next question directed to Mrs. Jackson refers to the slip held by her: "Had you at that time shown him the slip of paper you testified about", to which she replied, "I had it in my pocket and I opened it up to let him see I had it." Then follows: "What did that have", to which the witness answered, "It had a list of numbers and it was all totalled up at the bottom." And, finally, she was asked, "What did he say to you about that slip?" It may be inquired what was meant by "that slip". If we give the proper interpretation to express language, "that slip" meant the slip which the witness said, "I had it in my pocket * * *." To the last question the witness' answer may not have been responsive, for she replied, "He said that was the original slip that was turned in and he showed me where they had made a mistake in the amount of money. That is why he said he couldn't pay off because it was not his mistake." Mrs. Jackson's testimony that Tabet on the occasion of one of her visits gave her a book of matches, advertising the Monarch Pool Room is explained by the testimony of Marple, manager of Monarch during the months of June and July, 1950, to the effect that matches of like character were kept on the counter of the pool room: "There are two or three small cartons on the counter all the time and anybody can get them."

Richardson's testimony is to the effect that he sold the purported winning number to Mrs. Jackson. He testified

that the winning number was daily posted on a score-board at No. 159 Summers Street, but this record does not disclose who posted the winning numbers. It certainly does not disclose that Tabet did or that Comer, manager of Diamond Billiards, did. The record is silent as to whether Tabet, who visited Diamond Billiards only occasionally, that is "about once a month", knew of the posting. Richardson did not testify, as heretofore stated, that he was employed by Tabet; he did not testify whose numbers he sold; and, furthermore, there is no testimony in this case showing that the numbers sold were turned in to Tabet at Monarch Pool Room, or at No. 155 or No. 159 Summers Street. Richardson's testimony, bearing on this question, was only to the effect that the numbers were turned in, during the time he was in the numbers business, "To No. 155 Summers Street."

The testimony of Marple, manager of Monarch Pool Room during the time Richardson was selling numbers, shows that he had been employed there for five years, and that he had never seen Richardson in the pool room, and it stands uncontradicted in this record. If Richardson had been employed by Tabet in the numbers business, it is hardly conceivable that the manager of Monarch Pool Room would not have seen him there on one or more occasions.

As the State failed utterly to prove Tabet's connection with the numbers slips which were found on the raided premises, these numbers slips were admissible only for the purpose of showing that a numbers business was being, or had been conducted, at No. 155 or No. 159 Summers Street, or at both places. The cards found during the raid at No. 159, showing the rules of a gambling game, are not identified as containing rules governing the "playing of numbers." As the record clearly shows, and without contradiction, that Tabet leased No. 155 to Levinson in 1948, and removed most of his effects and activities to Monarch Pool Room, the Standard Oil Company battery warranty and adjustment agreement, dated July 13, 1947, issued to Tabet; the membership cards in

Southern West Virginia Automobile Club in the names of Mr. and Mrs. Tabet, dated September 17, 1944; and the insurance policy on Tabet's life, dated September 17, 1944, which expired on September 17, 1945, found at No. 155 Summers Street are of no evidentiary value in establishing Tabet's guilt. The metal box, containing memorandum of items of cash payments to Tabet, is fully explained by the fact that the date "10/17", does not designate the year, and Tabet, without contradiction, testified they were for the year 1948. Bills of Charleston Towel & Linen Supply Company to Diamond Billiards, dated in 1949, were for uniforms and linens for Diamond Billiards, concerning which Tabet testified Comer, the manager thereof, had contracted. As to certain other items, bearing handwriting, defendant testified the handwriting was not his, and no effort was made by the State to disprove his statement in this regard. The items contained in the diary introduced into evidence, showing six thousand dollars and four hundred eighty-eight dollars in cash turned over to Tabet, dated in 1948, the latter of which is designated as "from $2,000.00 for Checks." Tabet testified were given to him for the purpose of cashing checks.

Defendant's witness Marple corroborated Tabet as to his conversations with Mrs. Jackson. This witness testified that, "He told her to get out of the place [Monarch Pool Room], that he didn't have anything to do with it, and didn't want anything to do with it; that she had bothered him enough." This statement stands uncontradicted in this record, and is, to some extent, established by Mrs. Jackson's own testimony.

So the single question before us is whether, assuming that a numbers business may have been conducted at No. 155 or 159 Summers Street, or at both places, the State has proved beyond a reasonable doubt that the defendant Tabet, who was merely the original lessee of No. 155 Summers Street and a stockholder in Diamond Billiards, the tenant at No. 159 Summers Street at the time of the raids, was actually connected with said business?

In the appraisement of this case this Court is not, and should not, concern itself with the guilt or innocence of the accused: its plain duty, which through the course of years it has not shirked, is to require that the guilt of a person charged with crime be established beyond a reasonable doubt. True, the circumstances portrayed by this record create a strong suspicion of defendant's guilt, but that does not satisfy the reasonable doubt rule. In the recent case of *State* v. *Hudson*, 128 W. Va. 655, 670, 37 S. E. 2d 553, 560, the opinion in which was written by Judge Haymond, this Court said: "Though the conduct of the defendant, in these circumstances, creates strong suspicion of guilt, it is not sufficient to establish his guilt when considered alone or in connection with the other facts shown by the evidence. A conviction based on mere suspicion, however strong, of the guilt of the accused, can not stand.", citing *State* v. *Beall*, 98 W. Va. 189, 126 S. E. 569; *State* v. *Chafin*, 78 W. Va. 140, 88 S. E. 657; *State* v. *White*, 66 W. Va. 45, 66 S. E. 20. See also *State* v. *Dudley*, 96 W. Va. 481, pt. 3 syl., 123 S. E. 241; *State* v. *Campbell*, 115 W. Va. 198, pt. 1 syl., 174 S. E. 797. In the *Hudson* case this Court reversed the judgment of conviction on the ground that the State had not established the defendant's guilt beyond a reasonable doubt, and at page 670 of the opinion, the Court, citing *State* v. *Scurlock*, 99 W. Va. 629, 130 S. E. 263; *State* v. *Campbell, supra; State* v. *Dudley, supra,* said: "The law requires the guilt of a defendant in a criminal case to be established by competent evidence beyond a reasonable doubt. The burden rests upon the State to prove the guilt of one accused of crime not merely by a preponderance of the evidence but by evidence sufficient to establish his guilt beyond a reasonable doubt."

Though this evidence portrays circumstances, which create a strong suspicion of defendant's guilt, we are of opinion that the State in this case has not adduced evidence sufficient from which a jury could find beyond a reasonable doubt, that, even if a numbers business was being conducted on the raided premises, Tabet had any

connection therewith at the time the crime is charged to have been committed in the indictment; and, that being so, this Court is not only justified, but should, reverse the judgment of conviction and set aside the verdict. *State* v. *Hudson, supra; State* v. *Chafin, supra;* and *State* v. *White, supra.*

As this case may be retried on remand, we deem it advisable to address ourselves to defendant's fourth assignment of error that the trial court erred in refusing to permit defendant's counsel to examine Captain Williams' memoranda, and the contents of the envelope found at No. 159 Summers Street, which were not offered in evidence. The cases cited by defendant's counsel in support of this assignment of error are not in point, and because the envelope with its contents was not introduced into evidence, the State could not be required to present it to defendant's counsel for inspection. So, in our opinion, this assignment of error is without merit.

For the foregoing reasons the judgment of the Circuit Court of Kanawha County, in refusing the writ of error to the judgment of conviction of the Intermediate Court of Kanawha County, and the judgment of said intermediate court, are reversed, the verdict set aside, and a new trial awarded.

> *Judgment reversed;*
> *verdict set aside;*
> *new trial awarded.*

Fox, PRESIDENT, dissenting:

The adroit, if somewhat labored defense of the defendant, contained in the majority opinion, has not convinced me that the judgment of the trial court, or that of the Circuit Court, should be reversed, and the verdict of the jury, on which it was based, set aside. Therefore, I dissent.

No one will question the statement that in the trial of a criminal case the guilt of the defendant must be established beyond all reasonable doubt; or that a conviction

based solely on mere suspicion of guilt, however strong, cannot stand. But, in my opinion, this is not such a case. The verdict returned by the jury in this case is not based on suspicion. It is based upon direct testimony of witnesses, and by strong circumstances. It is true that the evidence is in conflict on certain points, requiring the jury to decide as to what evidence should be believed and what disbelieved. Where the evidence in the case, and the inferences which may be drawn therefrom, creates a situation where the minds of reasonable men may differ, as we think is the situation in this case, we are not permitted to disturb a jury verdict.

In this case, there is the testimony of Eloise Jackson, which, if believed, is alone sufficient to justify the jury verdict. When she was not paid her winnings, she went to the defendant and made demand therefor. She also gave this testimony about a conversation she had with Tabet about the ticket she asked him to pay: "A. I asked him if he was going to pay it." "Q. What did he say?" "A. He said he had half of it, $25.00, but he found out I had gone to see the policeman and he said somebody down at the police station there told him I had seen Captain Williams." Tabet denied he had anything to do with the numbers game, but from his own testimony, it appears he was fully acquainted with the situation which brought the Jackson woman to him. He explained to her that a mistake had been made. The plain inference is that if such mistake had not been made, the money claimed would have been paid to her. Her testimony clearly shows that Tabet knew of the mistake. This could scarcely have happened if he had not had some previous knowledge of it, or felt himself under some responsibility. Tabet denies most of the testimony of the Jackson woman, but evidently the jury believed her testimony, and did not believe that of Tabet, that he had no connection with the numbers game. This they had a right to do, and this Court has no right to substitute its judgment on this point for that of the jury.

But this is not all that appears in the case which sustains the jury verdict. Richardson who sold the ticket to Eloise Jackson made his reports to 155 Summers Street, which was leased to and controlled by Tabet. Both 155 and 159 Summers Street were controlled by Tabet according to his own statement. One was occupied by the Diamond Poolroom and the other by a shoeshine shop. When the raid was made, evidence that the numbers game was being conducted in both of them was found, and evidence of various transactions by which money was paid to a man by the name of Davis, and large sums of money were at different times paid to Tabet, and by him paid to Davis, and perhaps others. Memorandums of sums paid to various people, many blank number slips, and instructions pertaining to the numbers game were found. In one instance, $6,000.00 was involved, and in another instance more than $2,000.00 was involved. In short, everything indicates that the numbers game was being operated at these two addresses.

It cannot be doubted from the testimony that the defendant Tabet was in control. He rented the properties from the owner, Boggs, and paid the rent. Tabet in his own testimony says: "I own both places," referring to the shoeshine parlor and the Diamond Poolroom. The shoeshine parlor was leased by him to Lonzo Peace at $50.00 per week, and not $50.00 per month as the majority opinion states. As to the Diamond Poolroom he testified on cross examination: "A. I own the Diamond." "Q. It is your business?" "A. That is right." The majority opinion contains this statement: "Except for Tabet's stockholdership in Diamond Billiards and his position as original lessee of No. 155 Summers Street; and the slips bearing the legend 'Cash to Tabet', and the diary found in the safe, which contained a list of cash turned over to defendant and to F. E. Davis, there is nothing in this record to indicate that defendant had any connection with No. 155 or No. 159 Summers Street, after his removal to the Monarch Pool Room." This statement is directly contradicted by the testimony of Tabet. He stated that

he owned the majority stock of the Diamond Poolroom and of the shoeshine parlor, but not all of the shares. He also testified that he owned the majority of the stock in Monarch Billiards. When asked if he did not instruct the people who were operating these places what to do, and how to do it, he replied: "In the case of the Monarch, I ran it myself. As to the Strand, it was not open until September, a week before I came here. The Diamond I ran from a distance and gave my instructions." He was the principal owner and operator of the businesses at 155 and 159 Summers Street, and the jury had a right to believe that he knew what transpired at both places. Therefore, the statement which implies that there is no substantial evidence in the record indicating that the defendant had any connection with these establishments is in direct conflict with the record.

The indictment in this case is in six counts, and I need not go into detail as to what it contains. Suffice to say that it charges the defendant, in the language of the statute, with different offenses in connection with the numbers game, including the possession of numbers tickets, and the control of the location where they were sold. The lower court correctly held that the defendant was not entitled to require the State to elect on which count it would rely for conviction, at the time a demand therefor was made. Therefore, if the evidence is sufficient to justify a general verdict based on evidence sufficient to sustain any one count of the indictment, the verdict and the judgment thereon must stand. This Court is not warranted, under the evidence in this case, in substituting its judgment for that of the judgment of the jury in returning its verdict. We cannot say that the verdict is without evidence to support it, nor can we say the verdict is plainly wrong, or that the evidence is not sufficient to establish the guilt of the defendant beyond a reasonable doubt. For these reasons, the verdict and the judgment thereon should be upheld by this Court. I would affirm the judgments of the Intermediate Court

of Kanawha County and the Circuit Court of Kanawha County.

I am authorized to say that Judge Haymond concurs in this dissent.